# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| Stratasys, Inc., | § | |
| Plaintiff, | § § § | |
| v. | § § | Case No. 2:24-cv-00644-JRG<br>(Lead Case) |
| Shenzhen Tuozhu Technology Co., Ltd., et al., | § § § | |
| Defendants. | § § § | |

| | | |
|---|---|---|
| Stratasys, Inc., | § § | |
| Plaintiff, | § § | Case No. 2:24-cv-00645-JRG<br>(Member Case) |
| v. | § § | |
| Shenzhen Tuozhu Technology Co., Ltd., et al., | § § | |
| Defendants. | § | |

| | | |
|---|---|---|
| BambuLab USA, Inc., et al., | § § | |
| Plaintiffs, | § § | Case No. 2:25-cv-00465-JRG<br>(Member Case) |
| v. | § § | |
| Stratasys, Inc. | § § | |
| Defendant. | § § | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND FALSE ADVERTISING

Plaintiff Stratasys, Inc. ("Plaintiff" or "Stratasys"), by and through its undersigned counsel,

brings this First Amended Complaint for patent infringement and false advertising against

Defendants Shenzhen Tuozhu Technology Co., Ltd., Shanghai Lunkuo Technology Co., Ltd., BambuLab Limited, and Tuozhu Technology Limited, and Counter-Defendant BambuLab USA (collectively, "Bambu Lab" or "Defendants") and would respectfully show the Court as follows:

## I.    PARTIES

1.    Stratasys is one of the pioneers in the field of three-dimensional (3D) printing technology, founded in 1988.  Plaintiff Stratasys, Inc. is a Delaware corporation with its place of business located at 7665 Commerce Way, Eden Prairie, Minnesota.

2.    On information and belief, Defendant Shenzhen Tuozhu Technology Co., Ltd. (深圳拓竹科技有限公司, hereafter, "Shenzhen Tuozhu") is a company organized and existing under the laws of the People's Republic of China. On information and belief, Shenzhen Tuozhu operates under the brand name "Bambu Lab" and holds itself forth under the English name Shenzhen Bambu Lab Co., Ltd.  That name does not appear separately in China's National Enterprise Credit Information Publicity System.

3.    On information and belief, Defendant Shanghai Lunkuo Technology Co., Ltd. (上海轮廓科技有限公司, hereafter, "Shanghai Lunkuo") is a company organized and existing under the laws of the People's Republic of China. On information and belief, Shanghai Lunkuo conducts business, either directly or through its agents, on an ongoing basis in this judicial district and elsewhere in the United States.  On information and belief, Shanghai Lunkuo holds itself forth under the English name Shanghai Contour Technology Co., Ltd.  That name does not appear separately in China's National Enterprise Credit Information Publicity System, as Lunkuo is a phonetic spelling of the Chinese word that translates to Contour.

4.      On information and belief, Defendant Bambulab Limited is a company organized and existing under the laws of Hong Kong SAR, China, and is a wholly-owned subsidiary of Shenzhen Tuozhu Technology Co., Ltd.

5.      On information and belief, Defendant Beijing Tiertime Technology Co., Ltd. (北京太尔时代科技有限公司), is a company organized and existing under the laws of the People's Republic of China.

6.      On information and belief, Defendant Beijing Yinhua Laser Rapid Prototyping and Mould Technology Co. Ltd. (北京殷华激光快速成形与模具技术有限公司), is a company organized and existing under the laws of the People's Republic of China.

7.      On information and belief, Defendant Tuozhu Technology Limited, is a company organized and existing under the laws of Hong Kong SAR, China, and is a wholly-owned subsidiary of Shenzhen Tuozhu Technology Co., Ltd.

8.      On information and belief, Counter-Defendant BambuLab USA is a Texas corporation with a principal place of business at 8000 Centre Park Dr, Austin, Texas 78754.

## II.      JURISDICTION AND VENUE

9.      This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 et seq. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.      This Court has personal jurisdiction over Defendants at least because they (1) have committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; (2) regularly did business or solicited business in this District; (3) engaged in other persistent courses of conduct and derived substantial revenue by its offering of infringing products and services and providing infringing products and services in this District; and (4)

purposefully established substantial, systematic, and continuous contacts with this District and should have reasonably expected to be subject to suit here by its offering of infringing products and services and providing infringing products and services in this District.

11.    Defendants conduct business, either directly or through its agents, on an ongoing basis in this judicial district and elsewhere in the United States.  On information and belief, Defendants are responsible for the research, development, and manufacturing of Bambu-branded products imported, sold, offered for sale, and/or used in the United States, including Bambu's three-dimensional (3D) printing products in this District.

12.    Defendants have sold their 3D printers and 3D-printer related products within this judicial district via their online store at https://store.bambulab.com/products.

13.    Defendants, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), have purposefully and voluntarily placed their infringing products into this district and into the stream of commerce with the intention and expectation that the infringing products will be purchased for use in this district. Defendants have imported, offered for sale and sold, and continue to import, offer for sale and sell, infringing products for delivery and use in this district.

14.    Venue is proper in this district under at least 28 U.S.C. §§ 1391(b), (c) and/or 1400(b). Venue in this district is proper for Defendants at least because they are foreign entities that have committed acts of infringement in this district as detailed throughout this complaint.

### III.    <u>BACKGROUND OF THE DISPUTE</u>

15.    Stratasys was founded in 1988 and is a pioneer in the field of three-dimensional printing.  Stratasys was the original innovator in the field of fused deposition modeling (also known as material extrusion 3D printing), which is an additive manufacturing process that prints three-dimensional objects from computer models by building up layers of one or more extruded

materials onto a platform using a device that has come to be generally known as a 3D printer. Stratasys has commercialized this technology (which it refers to as its "FDM" technology), and continues to do so today, selling Stratasys FDM® printers and filament, along with an ecosystem of software, accessories and services.

16.    Stratasys is an indirectly wholly-owned subsidiary of Stratasys Ltd. Stratasys Ltd. is a publicly owned company organized under the laws of Israel, that is publicly traded in the United States on the NASDAQ (ticker symbol: SSYS).

17.    Stratasys's printers are backed by its proprietary technologies. Stratasys hold approximately 2,600 patents and pending patents internationally, and its 3D printing systems utilize its patented extrusion-based FDM®, inkjet-based PolyJet™, powder-bed-based SAF®, photopolymer-based P3™, and stereolithography technologies to enable the production of prototypes, tools used for production, and manufactured goods directly from 3D CAD files or other 3D content.

18.    In 2012, Stratasys, Inc. merged with Objet Ltd. to form the corporate entity Stratasys Ltd. Today, Stratasys Ltd. and its subsidiaries, including Stratasys, Inc., have more than 1,900 employees worldwide, hold approximately 2,600 granted or pending patents globally, and have received numerous awards for technology and leadership.

19.    Over the years, other companies began to make and sell 3D printers that incorporate features and capabilities involving the extrusion of materials in additive layers to form 3D objects. For example, by 2022, Defendants began making and selling its "Bambu Lab" branded printers. On information and belief, the Bambu Lab printers are sold in the United States through direct sales over the Internet and through resellers.

20.    On information and belief, Defendants have sold their printers, including their Bambu Lab A1 3D printer, A1 mini 3D printer, P1P 3D printer, X1-Carbon 3D printer, P1S 3D printer and X1E 3D printer.    Defendants also make available and distribute marketing, instructional, and support materials to customers through their website, and maintains a technical support staff that provides support to customers, including through their website.

21.    On information and belief, Defendants' printers (including their Bambu Lab A1 3D printer, A1 mini 3D printer, P1P 3D printer, X1-Carbon ("X1C") 3D printer, P1S 3D printer and X1E 3D printer) transmit data to Defendants' servers or servers operated by third parties under Defendants' control.  This includes, but is not limited to, Defendants' servers that may be located in China.

22.    In fact, Defendants have acknowledged that their printers have security concerns. In a November 2022 blog post, Defendants' representative stated that: "We admit that the security design of the whole Bambu Lab system was not the best from the very beginning. The honest reason is simply that the initial team has a background in robotics, but very little experience in network security. We now understand, thanks to the community contributions, that we have underestimated this issue, and there is no excuse for this."  https://blog.bambulab.com/answering-network-security-concerns/.

23.    On December 9, 2024, Defendants filed suit against Plaintiff in the United States District Court for the Western District of Court (the "WDTX case"). *BambuLab USA, Inc. et al v. Stratasys, Inc.*, No. 1:24-cv-01511-ADA, Dkt. No. 1 (W.D. Tex. Dec. 9, 2024). In the WDTX case, BambuLab sought declaratory judgment that the Stratasys Asserted Patents in this case and in member case No. 6:45-CV-645 are invalid.   The WDTX district court then transferred the

WDTX case to this Court, which was styled as *BambuLab USA, Inc. et al v. Stratasys, Inc.*, No. 2:25-cv-465 (465 Case).

24.    This Court consolidated the actions into the current case.

25.    In its filings, Defendants BambuLab entities expressly provided that it "will waive the application of 35 U.S.C. §299(a) for these consolidated cases." Dkt. 56 at 1. In light of BambuLab's waiver, the Court consolidated the 465 Case with the 644 Case and 645 Case for all pretrial purposes. In its order (Dkt. 52), the Court also stated that "Case No. 2:24-cv-00644-JRG shall continue to be the lead consolidated case for all pre-trial purposes, and that the member cases shall proceed according to the lead case's docket control order for all pre-trial purposes. (See Case No. 2:24-cv-00644-JRG, Dkt. No. 34.). Post completion of all consolidated pretrial matters, the First Portion of Case No. 2:25-cv-00465-JRG shall be consolidated with Lead Case No. 2:24-cv-00644-JRG for all purposes, including through trial. Also post completion of all consolidated pretrial matters, the Second Portion of Case No. 2:25-cv-00465-JRG shall be consolidated with Member Case No. 2:24-cv-00645-JRG for all purposes, including through trial." *See* Dkt. 52 at 4-5.

## IV.    DEFENDANTS' MARKETING AND ADVERTISING ACTIVITIES

26.    Defendants are in the business of manufacturing, importing and selling 3-dimensional printers. As part of their business operations, Defendants have elaborate marketing and advertising campaigns describing the capabilities and functions of BambuLab's 3-D printers.

27.    Defendants conduct their marketing and advertising activities in a variety of forums, including on their website www.bambulab.com.

28.    In addition, Defendants maintain and publish a "Wiki" website where they market, advertise, describe and explain the features and functions of their 3-D printers.    See wiki.bambulab.com ("Wiki").

29.     The purpose of Defendants' Wiki site is to promote their 3-D printer products and to allow consumers to learn more about the features and functions of BambuLab's 3-D printers.

30.     Defendants' Wiki site is a website that functions as a centralized repository of information, organized through interconnected pages and accessible by hyperlinks. BambuLab's Wiki site is designed to permit the rapid creation, updating, and sharing of content, using simplified formatting and navigation to the consuming public.

31.     Because of their versatility, BambuLab's Wiki site serves as an efficient system for consolidating and disseminating information. These webpages on the Wiki site are frequently used to publish product specifications, technical support resources, or other customer-facing materials that are designed to market and advertise the features and capabilities of Defendants' 3-D printers.

32.     Defendants' Wiki site includes an "About Us" webpage that confirms BambuLab as the creator, author, publisher and disseminator of the content on the Wiki site. *See* https://wiki.bambulab.com/en/about-us.



33.     One of the features of BambuLab's 3-D printers advertised on its website is the printers' ability to print a 3-dimensional object using two print heads or nozzles.  For example, BambuLab touts the "Dual-Nozzle Double Flexibility" feature of its printers on https://bambulab.com/en-us/h2d.



34.     The BambuLab website also advertises that its printers are capable of printing 3-dimensional objects using multiple colors and materials that are deposited to print the 3-dimensional object.  *See* https://bambulab.com/en/x1.




35.     The BambuLab Wiki site further advertises and markets the Automatic Material System (AMS) as having four filament slots that hold filament. The AMS 2 Pro Wiki describes the AMS 2 Pro as an accessory designed to integrate with Defendant's 3D printers, and provides detailed instructions on its structure, operation, and connection to various printer models.

36.     The AMS 2 Pro Wiki states that the AMS 2 Pro includes four filament slots, each equipped with an independent feeder, motor, gear system, and sensor to advance or retract filament. It further explains that ceramic-reinforced bushings are embedded in each feeder to reduce wear from prolonged use.

**Filament slots**

The AMS 2 Pro has four filament slots, each with one feeder inside. It has a separate motor and gears to push the filament forward or pull it back to the spool, and a sensor to detect the filament. When the filament is inserted, the feeder pulls the filament inward. When it needs to pull the filament back into the spool, the drive shaft will turn the spool to rewind it. **Ceramic-reinforced anti-wear bushings are embedded in each feeder inlet to better protect the inlet from being worn by the filament after prolonged use.**

| Filament slots | Feeder inlet |
|---|---|

*See* https://wiki.bambulab.com/en/ams-2-pro/manual/intro-and-connection-guide

37.     The AMS 2 Pro Wiki describes that when printing with multiple filaments, the AMS 2 Pro automatically manages the process of switching between materials. Each of the four filament slots is equipped with an independent feeder and sensor system. When a print job requires a different filament, the system retracts the active filament back into its slot and spools it for storage. At the same time, the internal hub and buffer coordinate the loading of the next selected filament. Sensors detect the presence and position of the filament, while a brushless motor and controlled buffer mechanism ensure the new filament is advanced into the extruder at the correct tension.

**Internal hub**

The internal hub is located at the rear of AMS 2 Pro and consists of four Hall sensors, a magnetic rotary encoder, and a brushless motor. It merges four filament slots into one. The Hall sensor detects when the filament reaches a specific position and activates the brushless motor to provide a second-level driving force for feeding the filament.

 

*See* https://wiki.bambulab.com/en/ams-2-pro/manual/intro-and-connection-guide

38.    The AMS 2 Pro Wiki also describes an internal hub, located at the rear of the AMS 2 Pro, that consolidates inputs from the four filament slots. The hub employs sensors and a brushless motor to drive filament forward.



39.    According to the AMS 2 Pro Wiki, the AMS 2 Pro connects to printers through a buffer system that includes a slider, spring, and sensor. This buffer communicates with the printer to maintain controlled filament tension, thereby ensuring precise and smooth extrusion.

- 11 -

**Buffer**

The AMS 2 Pro and printer need to be connected via a buffer, which consists of a slider, a spring, and a Hall sensor. When the AMS pushes the filament into the extruder, the slider moves forward due to the pressure of the filament. The Hall sensor detects the slider's position, and the buffer sends the signal back to the AMS and the printer. By controlling the feeding speed of the AMS, the tension of the filament can be kept within a controlled range, allowing the extruder to work smoothly and precisely.

The H2D printer comes with a built-in feeding buffer, which also includes a filament sensor inside. **This sensor can detect whether the filament is passing through the buffer or if the filament has broken inside the buffer. Additionally, when printing with an external spool, the buffer also features a tangle detection function, which can detect whether the external spool has tangled filament.**

*See* https://wiki.bambulab.com/en/ams-2-pro/manual/intro-and-connection-guide.

40.     The AMS 2 Pro Wiki explains that the AMS 2 Pro includes RFID coils that recognize Bambu-branded filament spools, enabling functions such as filament usage estimation and automatic backup when filament is depleted.



**RFID system**

The AMS 2 Pro has two RFID coils, which can recognize the RFID tags on the official Bambu Lab filament and enable functions such as filament remaining estimation and auto filament backup.

*See* https://wiki.bambulab.com/en/ams-2-pro/manual/intro-and-connection-guide

41.     The AMS 2 Pro Wiki explains that the switching process allows the printer to alternate between filaments layer by layer or feature by feature, depending on the instructions contained in the slicing software. For example, when printing a multi-color object, the AMS 2 Pro

loads the appropriate color at the designated layer, while simultaneously retracting and preserving the prior filament for later reuse. The integrated RFID recognition system identifies compatible filament types and automatically configures backup spools if a filament runs out. By combining automated feeding, real-time tension control, and software-directed switching, the system enables continuous, precise multi-material printing without requiring manual intervention by the user.

**Method 1 — Using the AMS Hub (Recommended)**

The AMS Hub ⧉ is designed for stable and efficient multi-AMS connections. It ensures smooth filament switching and minimizes feeding errors.

*See* https://wiki.bambulab.com/en/ams-2-pro/manual/intro-and-connection-guide

42.    The AMS 2 Pro Wiki provides instructions for connecting multiple AMS units to a single printer, either by using an AMS Hub (the recommended method for stable multi-unit operation) or a PTFE Tube Adapter.

43.    Through this Wiki, Defendant presents the AMS 2 Pro as a multi-component system providing automated filament storage, feeding, drying, and multi-color or multi-material printing functions, and instructs users on how to configure and operate it with Defendants' printers.

44.    The BambuLab Wiki site also explains how the printers switch print nozzles and filament when printing 3-D objects made from multiple materials. *See* https://wiki.bambulab.com/en/software/bambu-studio/manual/dual-nozzles-slicing-filament-grouping ("Dual Nozzle Wiki").

45.    The Dual Nozzle Wiki page explains that when a printer uses a single nozzle, switching between filaments requires flushing out residual material to "avoid color mixing during printing," and that "the flushing values vary between different materials" and are calculated by the slicer software. In contrast, for dual-nozzle printers "the optimal way to print two filaments is to print different filaments with different nozzles," which allows switching "only [by] switching the

nozzles rather than flushing the old filament with the new one." This design, according to Defendant, "can also reduce the number of filament flushes when printing more than two filaments."

### 1. Background

When switching between different filaments for printing on a single nozzle (hotend) printer, it is necessary to use a certain amount of new material to flush the residual material in the hotend, to avoid color mixing during printing. The flushing values vary between different materials, and the specific values can be viewed on the filament page of Bambu Studio. You can refer to the wiki to learn more: Reduce Waste during Filament Change

For a dual-nozzle (hotend) printer like the H2D, the optimal way to print two filaments is to print different filaments with different nozzles. In this case, switching between filaments only requires switching the nozzles rather than flushing the old filament with the new one. Switching nozzle printing can also reduce the number of filament flushes when printing more than two filaments. This article will introduce filament grouping strategies for dual-nozzle printers to achieve the most efficient or convenient multi-material printing method.

*See* https://wiki.bambulab.com/en/software/bambu-studio/manual/dual-nozzles-slicing-filament-grouping.

46.    The Dual Nozzle Wiki further details how the slicer software "will calculate an optimal printing sequence based on the flushing volume between the filaments, to minimize the waste amount." It provides examples showing that the sequence in which filaments are ordered (e.g., "1->2->3" versus "1->3->2") will affect the total amount of flushing required.

### 2. Multi-color printing sequence

Different printing sequences have different filament switching sequences, resulting in differences in the flushing volume. The slicer will calculate an optimal printing sequence based on the flushing volume between the filaments, to minimize the waste amount. For example, if the total flushing amount of filament sequence 1->2->3 is greater than that of 1->3->2, the latter will tend to be used as the printing sequence for this layer. For detailed information on manually adjusting print sequences, please refer to: Set the filament printing sequence for different layers

*See* https://wiki.bambulab.com/en/software/bambu-studio/manual/dual-nozzles-slicing-filament-grouping.

47.    In short, Bambu Lab's Wiki instructs customers that its dual-nozzle printers can automatically calculate optimal filament sequences, switch between nozzles, enforce nozzle-based material restrictions, and operate in multiple modes to reduce filament waste and streamline multi-material printing.

48.     Three-dimensional printers typically use a heated platform or plate where the 3D object is built/printed. A heated build plate (or a heated print bed) is a printer component that uses electrical resistance to generate and evenly distribute heat across the build surface. During printing, it maintains a controlled temperature at the interface between the first printed layers and the bed so that newly extruded filament does not cool too rapidly. In practical terms, the heated bed improves adhesion, keeps parts flat by mitigating thermal contraction and edge lifting (warping), and reduces the likelihood that a print will detach in the middle of a build process. A heated bed promotes layer bonding, dimensional stability, and overall print quality. After printing, as the bed cools, many parts naturally release from the surface, which can lessen post-processing effort and the risk of damaging the workpiece during removal.

49.     Defendants advertise their 3D printers as having a heated bed or a heated plate.  For example, the "Bambu Store" webpage states that "The heatbed in the X1 series printer is a platform installed inside the printer chamber. It can move up and down along the Z-axis and can be heated based on the temperature set by the user. Setting an appropriate heat bed temperature can enhance model adhesion to the build plate, preventing warping." *See* https://us.store.bambulab.com/products/heatbed-unit-v3-x1-series?srsltid=AfmBOoph5115Wu9m2DkDbIhIOyrGWidqpCEgiw2o8oEMJJ8yBL3wUcfW.



50.     As another example, Defendants advertise their heated build platforms for the P1 series printers on the "Bambu Store" as having a "heatbed in the P1 series printer is a platform installed inside the printer chamber. It can move up and down along the Z-axis and can be heated based on the temperature set by the user. Setting an appropriate heat bed temperature can enhance model adhesion to the build plate, preventing warping." *See* https://us.store.bambulab.com/products/heatbed-unit-v3-p1-series?srsltid=AfmBOoqVmwXDbddequ36y1z-g_mxHq5bKlCYIPaAd99th2jf_LBPo1Tj.



51.     As another example, Defendants advertise their heated build platforms for the A1 mini series printers on the "Bambu Store" as having a "heatbed unit of the A1 mini is a printing platform installed on the printer, which can move back and forward along the Y direction and can be heated according to the temperature set by the user. Setting a suitable heat bed temperature can effectively improve adhesion between the model and the build plate and prevent the model from warping. Please follow our recommended heatbed temperatures for each filament to get the best results.." *See* ht https://us.store.bambulab.com/products/a1-mini-heatbed-unit?srsltid=AfmBOorAAJcaP-ffQiTtJ5f2xKYE_U1-mTMktM59E0dLtSlU2WPiYdsa.



52.     Defendants' Wiki site also claims that their 3D printers have a heatbed, which is a platform inside the printer chamber.  For example, the Heatbed Wiki site says "The heatbed in the X1 series printer is a platform installed inside the printer chamber. It can move up and down along the Z-axis and can be heated based on the temperature set by the user. Setting an appropriate heat bed temperature can enhance model adhesion to the build plate, preventing warping. We have modified the heatbed structure for improved assembly and reliability." *See* https://wiki.bambulab.com/en/x1/maintenance/Replacing-the-heat-bed-v3.



53.    Defendants even provide instructions on how to replace the heatbed on the Wiki site. Defendants publish these instructions on replacing the heated bed in its X1 series printers by advertising that "[s]etting an appropriate heat bed temperature can enhance model adhesion to the build plate, preventing warping." The heatbed Wiki site explains that the Heatbed Unit V3 maintains "the same functionality as the Heatbed Unit V2," while being designed for "improved assembly and reliability." *See* https://wiki.bambulab.com/en/x1/maintenance/Replacing-the-heat-bed-v3.

54.    Similar advertisements and marketing statements have been made in other portions of the Wiki site. *See* https://wiki.bambulab.com/en/x1/maintenance/Replacing-the-heat-bed.

55.    The heatbed Wiki site further markets the heated bed as a critical component of the printer's build system that must be connected to the corresponding control boards to function properly. It provides detailed instructions for removing the existing heated bed, disconnecting and reconnecting power and signal cables, installing the new bed onto the Z-axis sliders, and securing it with multiple screws and grounding components. Upon completion, the guide directs users to reconnect the printer, power it on, and perform a device self-test to confirm that the heated bed is

operating correctly. *See* https://wiki.bambulab.com/en/x1/maintenance/Replacing-the-heat-bed-v3.

56.    Defendants also advertise and market their 3D printers as having a "temperature heating control feature" that can be configured to control the heating of the build platform. *See* https://wiki.bambulab.com/en/software/bambu-studio/chamber-temperature.

57.    For example, there is a dedicated Wiki site for "Bambu Studio chamber temperature setting" that states "X1E offers an additional chamber temperature heating control feature, with a max chamber temperature of 60 °C. Higher chamber temperatures can suppress the warping of certain high-temperature filaments' prints and provide higher interlayer strength (layer adhesion) of some prints. When printing high-temperature filaments such as PC, PA-CF, PAHT-CF, PET-CF, PPA-CF, PPS and PPS-CF, selecting X1E and enabling a chamber temperature of 60 °C can result in improved dimensional accuracy and visual quality of some prints. Furthermore, when printing the aforementioned high-temperature filaments, selecting X1E and enabling a chamber temperature of 60 °C can enhance the strength, especially the interlayer strength,  of some prints. **Warning:** It is strongly recommended not to enable high chamber temperature when printing PLA, PETG, TPU, PVA and other low-temperature filaments. Enabling high chamber temperature may cause these filaments to soften and become lodged in the extruder, resulting in clogging issues. When printing such low-temperature filaments, it is advised to set the chamber temperature to 0 °C (i.e., disable chamber temperature control)." *See* https://wiki.bambulab.com/en/software/bambu-studio/chamber-temperature.

58.    The temperature control Wiki site provides detailed instructions on how to control the temperature for the chamber and the heatbed, as shown below.



### 2. Recommended chamber temperatures for various filaments

(1) PLA, PETG, TPU, PVA, PLA's supports and other low-temperature filaments:

Chamber temperature setting: The default chamber temperature setting is off (0 ℃).

Tips:  To prevent cloggings, avoiding high chamber temperatures and set the chamber temperature to 0 ℃ when printing low-temperature filaments is highly recommended. . Additionally, when the bed temperature is equal to or greater than the filament's softening temperature, it is advised to open the front door and remove the top cover of the printer. When the ambient temperature is high, the actual chamber temperature may be higher, and the need to open the front door and/or removethe  top cover is stronger; conversely, when the ambient temperature is low, the actual chamber temperature is usually relatively low, and the need to open the front door and/or remove the top cover is  weaker. For example, the softening temperatures of most kinds of PLA and PETG are about 45 ℃ and 70 ℃ respectively.

(2) ASA, ABS:

Chamber temperature setting: The default chamber temperature setting is off (0 ℃).

Tips: When the chamber temperature is enabled, some models with lager size and/or higher infill density can experience reduced warping, resulting in improved print quality and dimensional accuracy. Additionally, the interlayer strength of some models can be enhanced. However, the preparation time before printing will get longer, and the air filtration will get worse. In order to obtain better air filtration effect, we choose to disable the chamber temperature by default. Please decide whether to turn on the chamber temperature based on the actual situation. Our suggestion is that for those prints that are prone to warping, that is, those with larger sizes and/or higher infill density, or those with higher strength requirements, please enable the chamber temperature to be 60℃, while for other normal prints, it is recommended not to enable it.

(3) PC, PA, PA-CF, PAHT-CF, PA6-CF, PET-CF, PPA-CF, PPA-GF, PPS, PPS-CF and other high-temperature filaments:

Chamber temperature setting: The default chamber temperature setting is on (60 ℃).

Tips: With high chamber temperatures, some models with lager size and/or higher infill density can experience reduced warping, improving quality and dimensional accuracy. Additionally, the interlayer strength of some models can be enhanced.

### 3. Chamber Temperature Setting Instructions

**3.1 Setting Chamber Temperature (Recommended) in Bambu Studio**

Step 1: Select the X1E model.

Step 2: Select the desired filament type.

Step 3: Click on the filament parameter editing button.

Step 4: Locate the chamber temperature setting field.

The chamber can be set within the range of 0 ℃ to 60 ℃ (the chamber temperature heating control module only operates within the range of 40 ℃ to 60 ℃).

Setting the chamber temperature to 0 ℃ represents disabling the chamber temperature heating control.

When the chamber temperature is set below 40 ℃, the chamber temperature heating control will not take effect. In other words, setting the chamber temperature between 0℃ and 40 ℃ (including 0℃ but not including 40 ℃) will result in the same practical effect.

For a low-temperature filament, to prevent clogging, it is recommended to set the chamber temperature below the designated safe temperature. If the chamber temperature is above the safe temperature, a pop-up prompt will appear to alert you.

*See* https://wiki.bambulab.com/en/software/bambu-studio/chamber-temperature.

59.     Defendants also market and advertise their printers as having a 'nozzle clumping detection' mechanism.  BambuLab's Wiki site  describes a "nozzle clumping detection" feature for its A1 series printers.  *See*  https://wiki.bambulab.com/en/a1-mini/manual/nozzle-warp-detection.  According to the Wiki site, nozzle clumping occurs when molten filament fails to adhere to the build plate and instead accumulates around the nozzle, which can cause print failures

and damage to the printer. To address this risk, BambuLab advertises its A1 printers as having a force sensor, also referred to as an eddy current sensor, to detect whether the nozzle experiences an unexpected force, emblematic of wrapped filament. During designated checks, the printer moves the nozzle outside the print area and makes a controlled touch. If the nozzle is clear, no force is detected; if it is covered in filament, the clump presses against the bed and the sensor detects the increased resistance. When clumping is detected, the printer automatically pauses and alerts the user to prevent further damage.



*See* https://wiki.bambulab.com/en/a1-mini/manual/nozzle-warp-detection:

60.     The Bambu Store for "Nozzle Eddy Sensor" also markets and advertises the sensor for use in "detect[ing] whether the nozzle is wrapped by molten filament." *See* https://us.store.bambulab.com/products/nozzle-eddy-sensor.



61.     BambuLab also advertises and markets its printers as having additional force sensors.  For example, the BambuLab Wiki page markets and advertises the BambuLab printers as having a contact sensor to detect the build plate position.  The Wiki page states: "The A1 series printers are equipped with the build plate position detection function, the printer can detect whether the user has placed the build plate properly before the printing starts, avoiding direct printing on the heatbed and causing printing failure or even damage to the heatbed."     *See* https://wiki.bambulab.com/en/a1-mini/manual/build-plate-detection.



62.    BambuLab also advertises and markets its printers as having an eddy current sensor that is used to detect if the nozzle has made contact with the heatbed.    *See* https://wiki.bambulab.com/en/a1/troubleshooting/homing-leveling-failure    ("For the Z-axis, homing will cause the toolhead to descend until the nozzle touches the heatbed. The eddy current sensor above the hotend will detect whether the nozzle has made contact with the heatbed.").



63.    The BambuLab Wiki page for the H2D printers also advertises those printers as having a force sensor.    *See* https://wiki.bambulab.com/en/h2/troubleshooting/hmscode/0300_2500_0001_0003 ("A force sensor is installed above each hotend on the left and right sides of the toolhead, designed to detect the extrusion force applied by the hotend. Additionally, the force sensor is crucial for functions such as homing, leveling, nozzle Z offset calibration, and dynamic flow calibration.").



64.    BambuLab also advertises and markets its printers as capable of performing tests to determine whether the printing conditions are suitable for the printer before fabrication begins. For example, the printers are advertised to perform diagnostic checks to ensure that temperature settings are compatible with the materials loaded in the AMS. For example, if the build volume temperature is set to 60°C but the filament's maximum safe temperature is 45°C, the BambuLab Wiki site shows that an error message is sent that prevents the print from continuing under unsafe conditions. *See* https://wiki.bambulab.com/en/software/bambu-studio/chamber-temperature.



65.    In addition, BambuLab has a Wiki page that advertises and markets its printers' ability to operate in conjunction with Bambu Studio software. *See* https://wiki.bambulab.com/en/x1/manual/print-from-bambu-studio. According to the BambuLab Wiki, Bambu Studio allows a user to send a sliced print file that includes a model of the 3D object to be printed directly to the printer via Wi-Fi.



66.     According to the Wiki site, the process involves importing the 3D model into Bambu Studio, adjusting settings, clicking the "Slice" button, and then selecting "Print." The user may then choose the target printer and enable or disable calibration options.

67.     According to the Wiki site, once the user clicks "Send," the print file is transmitted to the printer and the printing process begins.

68.     The print file that is advertised to be transmitted by BambuLab includes file types such as ".3mf", ".stl", ".stp", ".step", ".amf", and ".obj." *See* https://wiki.bambulab.com/en/software/bambu-studio/studio-quick-start.



69.     BambuLab Wiki site also advertises and markets that its printers are compatible with 3mf file formats. *See* https://wiki.bambulab.com/en/software/bambu-studio/3mf-compatibility.



70.     BambuLab's Wiki site explains that 3mf files are a "3D model file format." *See* https://wiki.bambulab.com/en/software/bambu-studio/3mf-compatibility.     According     to BambuLab's Wiki site "a 3mf file adhering to the 3MF Core Specification has only one root file containing all model data. When parsing the 3mf file, it retrieves from this root model file, and

only one model file can be read. On the other hand, a 3mf file following the 3MF Production Extension Specification not only has a root file but also stores the actual model data in different files. When parsing the 3mf file, it uses the index in the root model file to locate other files containing model data. This enables the simultaneous reading of multiple model files, achieving parallel processing of model data." *See* https://wiki.bambulab.com/en/software/bambu-studio/3mf-compatibility.

71.     BambuLab's Wiki site also advertises and markets its printers' ability to read 3D models from the 3mf files and states "The ability to successfully retrieve 3D models from the files is a critical criterion for the usability of 3MF files. An example of reading 3mf reads file is included in the lib3mf library of the 3mf Consortium. Therefore, employing Bambu Studio as the producer of 3mf file and the lib3mf as the consumer to read, a reading test is conducted. The 3MF files saved by Bambu Studio can be successfully read, retrieving model data without issues." *See* https://wiki.bambulab.com/en/software/bambu-studio/3mf-compatibility.

72.     BambuLab's Wiki site also touts the ability of its printers and associated software to provide users with an interface where they can remotely view and access the printer through a network and see an image of the 3D object being printed on a two-dimensional screen. *See* https://wiki.bambulab.com/en/software/bambu-studio/3mf-compatibility.



73.     Bambu Lab advertises and markets the capabilities of its printers and states that if the printer is found on the local network and has an SD card inserted, the file is sent directly to the printer. If not, the file is first transmitted to the Bambu cloud and then sent to the printer unless LAN mode is enabled.

74.     BambuLab further advertises that print files stored in the cloud are retained for 90 days by default, or for 72 hours if the user deletes the corresponding print history or enables incognito printing mode. The company also advertises certain security features, including that users who do not want their print files transferred to the cloud must either enable LAN mode or copy print files directly to the SD card in the printer.

75.     These statements are made by BambuLab on its public facing Wiki site to advertise and market the features of its printers in order to attract customers to purchase the printers from BambuLab.

76.     In addition, BambuLab's Wiki site advertises and markets the printers and associated software's ability to allow users to remotely monitor the status of the print job. *See*

https://wiki.bambulab.com/en/studio-handy/handy/bambu-handy-quick-start.   This capability is advertised to be provided through Bambu Handy software, among others.



77.    The Wiki site advertises Bambu Handy's ability to provide status of a print job to the client, which is marketed to be provided via the cloud server. *See* https://wiki.bambulab.com/en/studio-handy/handy/bambu-handy-quick-start ("Printing History: This option displays the printing history of jobs sent via the cloud for the current account over the last 3 months; jobs printed via SD card and LAN mode are not saved in the history. You can click on a specific record in the history to view the printing details or click the "Print Again" button to reprint the model. When printing again, you can manually select the material for that print, or you can print a specific part from that project when there are multiple parts. More information on printing specific parts will be covered in the advanced features section.").



78.     Unlike internal documentation or customer-only portals, Defendants' Wiki is not limited to existing customers or users but is expressly designed to reach a wide audience, including prospective purchasers of Defendants' products.

79.     The Wiki serves as a marketing and promotional tool for Defendants' products. By providing detailed explanations of product features, functionality, and advantages, the Wiki operates to "promote" and "advertise" those products in commerce.

80.     The Wiki repeatedly emphasizes the benefits of Defendants' products. As detailed above, the Wiki highlights how specific features improve reliability, prevent print failures, reduce waste, and expand material compatibility. These representations are designed to persuade readers of the superiority of Defendants' products, and thus function as commercial advertising and promotion.

81.     The Wiki is integrated with Defendants' online sales ecosystem. Throughout the site, Defendants link to its commercial storefront and product pages, including direct links to purchase specific consumables (such as filaments and accessories) or hardware components. By driving traffic from the Wiki to Defendants' online store, the Wiki directly facilitates commercial sales.

82.     The Wiki contains statements of fact about Defendants' products and about alternatives on the market. These statements are presented in a manner designed to influence consumer purchasing decisions by assuring potential customers of the reliability, safety, and superiority of Defendants' products.

83.     The Wiki is disseminated widely to the relevant purchasing public. Defendants promote the Wiki through its main website, through search engine optimization, and through integration with its software products. This broad dissemination ensures that the Wiki reaches not only existing users but also the general community of prospective 3D printing customers, thereby satisfying the requirement that advertising be sufficiently distributed to the relevant audience.

84.     The Wiki is written in a tone and style aimed at both novice and experienced 3D printing users, demonstrating that its intended audience extends beyond existing purchasers to the broader marketplace. The content is specifically designed to inform, educate, and persuade readers about the advantages of Defendants' products, which is a hallmark of advertising.

85.     Courts have recognized that nontraditional marketing materials—such as technical guides, blog posts, or online articles—constitute commercial advertising or promotion when they are used to promote a company's goods or services to prospective customers. Defendants' Wiki falls squarely within this definition because it is a systematic, promotional campaign designed to influence consumer purchasing decisions.

86.     The Wiki is not merely a neutral or passive instruction manual. Instead, it actively markets Defendants' products by extolling their features and highlighting how Defendant's printers and materials are acceptable solutions for users.

87.     Accordingly, Defendants' public-facing Wiki constitutes commercial advertising or promotion because it (i) consists of commercial speech, (ii) is made by a competitor in direct commercial competition with others, (iii) is intended to influence consumers to purchase Defendants' goods, and (iv) is disseminated broadly to the relevant purchasing public.

88.     Upon information and belief, and as discussed in detail further below, the statements made by Defendants identified above are false and/or misleading.


## V.    CAUSES OF ACTION

### COUNT 1: U.S. Patent No. 9,421,713

89.     Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

90.    On August 23, 2016, the United States Patent Office (USPTO) duly and lawfully issued United States Patent No. 9,421,713, entitled "Additive Manufacturing Method For Printing Three-Dimensional Parts With Purge Towers."  By assignment, duly recorded with the USPTO, Stratasys owns all substantial rights to the '713 Patent, including the right to sue and recover damages for all infringement.

91.    The '713 Patent generally relates to additive three-dimensional printing with purge towers.

92.    Bambu Lab has directly infringed, and continues to directly infringe the '713 Patent in violation of 35 U.S.C. 271(a) by using in the United States, without authorization, the accused products that practice various claims of the '713 Patent literally or under the doctrine of equivalents.  Those products include, for example, Bambu's X1C, X1E, and P1S, and P1P printers.

93.    As a non-limiting example, the Accused '713 Products meet every element of at least Claim 1 of the '713 Patent literally or under the doctrine of equivalents.  Claim 1 recites:

> 1. A method for printing a three-dimensional part with an additive manufacturing system, the method comprising:
>
> printing layers of the three-dimensional part and of a support structure for the three-dimensional part from multiple print heads or deposition lines using a layer-based, additive manufacturing technique;
>
> switching the print heads or deposition line between stand-by modes and operating modes in-between the printing of the layers of the three-dimensional part and the support structure;
>
> performing a purge operation for each print head or deposition line switched to the operating mode, the purge operation comprising printing at least one purge tower in a layer-by-layer manner, wherein the layers of the at least one purge tower are printed from the print head or deposition line switched to the operating mode.

94.    For example, Bambu Lab makes, uses, sells and offers to sell various additive manufacturing systems (i.e., 3D printers), including the X1C, X1E, P1S, P1P, A1, and A1 mini

which are used for printing three-dimensional parts. Bambu Lab's 3D printers print layers of a 3D part using an Automatic Material System (AMS), which supports multiple filament spools each having an independent deposition line operatively coupled to the print head of the 3D printer. Furthermore, Bambu Labs distributes Bambu Studio for use in conjunction with its 3D printers. Bambu Studio includes use of support material (as needed) in its slicer software, and it instructs the 3D printer to switch deposition lines between printing of part material and printing of support material. In addition, the Bambu Studio slicer software instructs the Bambu Labs 3D printers to perform a purge operation to a prime tower when a deposition line is switched between the part material and the support material. Bambu Lab thus directly infringed and continues to directly infringe each limitation of at least Claim 1 of the '713 Patent by using, in the United States, without authorization the Accused '713 Products.

95.     To the extent Defendants do not perform each and every limitation of the claims of the '713 Patent, Defendants jointly infringe those claims. In particular, Defendants direct or control its users of the Accused '713 Products to perform one or more limitations of the claims nationwide through its own websites, applications, and manuals, and expects and intends that the Accused '713 Products will be so used. For example, Defendants require customers and users to use the accused products through the applications Defendants produce and distribute for use. Defendants further require users of the accused products to agree to extensive terms and conditions. Finally, Defendants' customers realize a tangible benefit by using Defendants' technology to print and manufacture tangible items.

96.     Defendants also indirectly infringe at least Claim 1 of the '713 Patent in violation of 35 U.S.C. 271(b) by taking active steps to encourage and facilitate direct infringement by third parties, including users, partners, affiliates, subsidiaries, resellers, distributors and service

providers, in the United States with knowledge and specific intent that its efforts would result in the direct infringement of the '713 Patent. For example, Defendants actively induce infringement of the '713 Patent by designing, manufacturing, selling, or distributing the Accused '713 Products and then training its customers and users on the use of those products and the accompanying applications, including through the creation and dissemination of supporting materials, maintenance guides, troubleshooting guides, software (including Bambu Studio and Bambu Handy), instructions, product manuals, and technical information. *See* https://wiki.bambulab.com/en/home. As another example, Defendants actively induces infringement of the '713 Patent by instructing, encouraging, or requiring their subsidiaries and affiliates in the United States to use, sell, offer for sale in the United States, and importing into the United States, without authorization, the accused products that practice various claims of the '713 Patent, such as any Bambu Lab printer that is used in combination with the corresponding applications or controllers (e.g., the Bambu Studio and Bambu Handy, etc.). As yet another example, Defendants actively induce infringement of the '713 Patent through the creation and dissemination of promotional and marketing materials and instructional videos. *See* https://www.youtube.com/c/BambuLab. Defendants' active inducement is done with the knowledge and the specific intent that its efforts would result in the direct infringement of the '713 Patent.

97. Defendants were put on notice of their direct and indirect infringement of the '713 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '713 Patent and knowledge of how Defendants induce third parties to infringe that patent at least as early as August 5, 2024.

98.    Defendants are also liable for contributory infringement of the '713 Patent under 35 U.S.C. 271(c) by selling or offering for sale the Accused '713 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States and importing the Accused '713 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States with knowledge that they are especially designed or adapted to operate in a manner that infringes the '713 Patent and are not a staple article or commodity of commerce suitable for substantially non-infringing use.  Defendants contribute to infringement of the '713 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused '713 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) to third parties.

99.    Defendants also have had knowledge of how Defendants infringe the '713 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '713 Patent and knowledge of how Defendants contribute to third parties' infringement of that patent at least as early as August 5, 2024.

100.    Defendants' infringement of the '713 Patent has been and continues to be willful. At least as early as August 5, 2024, Defendants were notified of their infringing acts and deliberately continued to infringe the '713 Patent despite knowing of the existence of the patent and how Defendants infringe.  Further, Defendants have deliberately continued to encourage others' infringement of the '713 Patent, including by continuing to disseminate its marketing and technical materials to customers.

101.    Defendants' acts of infringement have injured and damaged Stratasys and will continue to injure and damage Stratasys.  Stratasys is therefore entitled to recover from Defendants

the damages it has sustained as a result of Defendants' wrongful and continued acts in an amount to be proven at trial.

102.    Defendants' infringement has damaged and will continue to damage Stratasys irreparably, and Stratasys has no adequate remedy at law for its injuries.  In addition to actual damages, Stratasys is entitled to a permanent injunction enjoining Defendants from infringing the '713 Patent.

103.    Stratasys is entitled to all damages to which it otherwise is entitled because it has complied with 35 U.S.C. 287 by marking its patent-practicing products with the number of the '713 Patent.

## COUNT 2: U.S. Patent No. 9,592,660

104.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

105.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

106.    On March 14, 2017, the United States Patent Office (USPTO) duly and lawfully issued United States Patent No. 9,592,660, entitled "Heated Build Platform And System For Three-Dimensional Printing Methods."  By assignment, duly recorded with the USPTO, Stratasys owns all substantial rights to the '660 Patent, including the right to sue and recover damages for all infringement.

107.    The '660 Patent generally relates to a base for printing 3D objects using high temperature thermoplastics using additive manufacturing methods.

108.    Bambu Lab has directly infringed, and continues to directly infringe the '660 Patent in violation of 35 U.S.C. 271(a) by using, selling, offering for sale in the United States, and

importing into the United States, without authorization, the accused products that practice various claims of the '660 Patent literally or under the doctrine of equivalents. Those products include, for example, Bambu's X1C, X1E, and P1S, P1P, A1 and A1 mini printers.

109. As a non-limiting example, the Accused '660 Products meet every element of at least Claim 1 of the '660 Patent literally or under the doctrine of equivalents. Claim 1 recites:

> 1. A build apparatus for printing a 3D object of thermoplastics employing additive manufacturing methods, the apparatus comprising:
>
> a build platform with a temperature control unit configured to control heating of the build platform;
>
> a thermally conductive plate disposed adjacent to the build platform; and
>
> a polymer coating attached to a surface of the thermally conductive plate which is capable of (i) facilitating adhesion to the 3D object during printing and (ii) permitting removal of the 3D object once the 3D object has been formed and cooled without chemically or mechanically removing the polymer coating from 3D object and without damaging the polymer coating, the thermally conductive plate, or the 3D object, wherein the polymer coating is not a polymer tape.

110. For example, Bambu Lab makes, uses, sells and offers to sell various additive manufacturing systems (i.e., 3D printers), including the X1C, X1E, P1S, P1P, A1, and A1 mini, which are used for printing three-dimensional parts using thermoplastic filaments. The Bambu printers have a heated build platform (i.e., heatbed). In addition, Bambu sells thermally conductive build plates with their 3D printers, such as the Bambu Engineering Plate, Textured PEI Plate, and High Temperature Plate, that are placed on the heatbed for fabrication of the 3D part. These build plates are made by coating a polymer (e.g., polyetherimide) onto a steel sheet, which facilitates adhesion of the 3D part to the build plate. The 3D object is removable from the build plate without chemically or mechanically removing the polymer coating and without damaging

the polymer coating, such as by flexing the build plate after the 3D object has cooled.  Bambu Lab thus directly infringed and continues to directly infringe each limitation of at least Claim 1 of the '660 Patent by using, selling, offering for sale in the United States, and importing into the United States, without authorization the Accused '660 Products.

111.    To the extent Defendants do not perform each and every limitation of the claims of the '660 Patent, Defendants jointly infringe those claims.  In particular, Bambu Lab directs or controls its users of the Accused '660 Products to perform one or more limitations of the claims nationwide through its own websites, applications, and manuals, and expects and intends that the Accused '660 Products will be so used.  For example, Defendants require customers and users to use the accused products through the applications Defendants produce and distribute for use. Defendants further require users of the accused products to agree to extensive terms and conditions.  Finally, Defendants' customers realize a tangible benefit by using Defendants' technology to print and manufacture tangible items.

112.    Defendants also indirectly infringe at least Claim 1 of the '660 Patent in violation of 35 U.S.C. 271(b) by taking active steps to encourage and facilitate direct infringement by third parties, including users, partners, affiliates, subsidiaries, resellers, distributors and service providers, in the United States with knowledge and specific intent that its efforts would result in the direct infringement of the '660 Patent.  For example, Defendants actively induce infringement of the '660 Patent by designing, manufacturing, selling, or distributing the Accused '660 Products and then training its customers and users on the use of those products and the accompanying applications, including through the creation and dissemination of supporting materials, maintenance guides, troubleshooting guides, software (including Bambu Studio and Bambu Handy), instructions, product manuals, and technical information.      *See*

https://wiki.bambulab.com/en/home. As another example, Defendants actively induces infringement of the '660 Patent by instructing, encouraging, or requiring their subsidiaries and affiliates in the United States to use, sell, offer for sale in the United States, and importing into the United States, without authorization, the accused products that practice various claims of the '660 Patent, such as any Bambu Lab printer that is used in combination with the corresponding applications or controllers (e.g., the Bambu Studio and Bambu Handy, etc.). As yet another example, Defendants actively induce infringement of the '660 Patent through the creation and dissemination of promotional and marketing materials and instructional videos. *See* https://www.youtube.com/c/BambuLab. Defendants' active inducement is done with the knowledge and the specific intent that its efforts would result in the direct infringement of the '660 Patent.

113. Defendants were put on notice of their direct and indirect infringement of the '660 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '660 Patent and knowledge of how Defendants induce third parties to infringe that patent at least as early as August 5, 2024.

114. Defendants are also liable for contributory infringement of the '660 Patent under 35 U.S.C. 271(c) by selling or offering for sale the Accused '660 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States and importing the Accused '660 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States with knowledge that they are especially designed or adapted to operate in a manner that infringes the '660 Patent and are not a staple article or commodity of commerce suitable for substantially non-infringing use. Defendants contribute to infringement of the '660 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused '660 Products

and/or other components (e.g., filament, automatic material system, build plates, etc.) to third parties.

115.    Defendants also have had knowledge of how Defendants infringe the '660 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '660 Patent and knowledge of how Defendants contribute to third parties' infringement of that patent at least as early as August 5, 2024.

116.    Defendants' infringement of the '660 Patent has been and continues to be willful. At least as early as August 5, 2024, Defendants were notified of their infringing acts and deliberately continued to infringe the '660 Patent despite knowing of the existence of the patent and how Defendants infringe.  Further, Defendants have deliberately continued to encourage others' infringement of the '660 Patent, including by continuing to disseminate its marketing and technical materials to customers.

117.    Defendants' acts of infringement have injured and damaged Stratasys and will continue to injure and damage Stratasys.  Stratasys is therefore entitled to recover from Defendants the damages it has sustained as a result of Defendants' wrongful and continued acts in an amount to be proven at trial.

118.    Defendants' infringement has damaged and will continue to damage Stratasys irreparably, and Stratasys has no adequate remedy at law for its injuries.  In addition to actual damages, Stratasys is entitled to a permanent injunction enjoining Defendants from infringing the '660 Patent.

119.    Stratasys is entitled to all damages to which it otherwise is entitled because it has complied with 35 U.S.C. 287 by marking its patent-practicing products with the number of the '660 Patent.

## COUNT 3: U.S. Patent No. 7,555,357

120.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

121.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

122.    On June 30, 2009, the United States Patent Office (USPTO) duly and lawfully issued United States Patent No. 7,555,357, entitled "Method For Building Three-Dimensional Objects With Extrusion-Based Layer Deposition Systems." By assignment, duly recorded with the USPTO, Stratasys owns all substantial rights to the '357 Patent, including the right to sue and recover damages for all infringement.

123.    The '357 Patent generally relates to methods of forming three-dimensional objects using an extrusion-based layered deposition system that generates a build path for building a layer of the three-dimensional object where the build path defines a void region.

124.    Bambu Lab has directly infringed, and continues to directly infringe the '357 Patent in violation of 35 U.S.C. 271(a) by using in the United States, without authorization, the accused products that practice various claims of the '357 Patent literally or under the doctrine of equivalents.  Those products include, for example, Bambu's X1C, X1E, and P1S, P1P, A1 and A1 mini printers.

125.    As a non-limiting example, the Accused '357 Products meet every element of at least Claim 15 of the '357 Patent literally or under the doctrine of equivalents.  Claim 15 recites:

> 15. A method of forming a three-dimensional object using an extrusion-based layered deposition system, the method comprising:
>
> generating a build path for building a layer of the three-dimensional object with a plurality of first deposition roads based on a first road width resolution, wherein the build path defines a

void region having dimensions that are smaller than the first road width resolution along at least one axis; and

generating a remnant path in the void region for filling at least [part] of a cavity corresponding to the defined void region with a second deposition road based on deposition rates that are configured to vary based on the dimensions of the void region.

126.    For example, Bambu Lab makes, uses, sells and offers to sell various extrusion-based layered deposition systems (i.e., 3D printers), including the X1C, X1E, P1S, P1P, A1, and A1 mini, which are used for printing three-dimensional parts.  A 3D model of the 3D object to be printed is loaded into Bambu Studio and sliced to generate a .3mf file, which is the file format used for the printer to be able to print the model. The .3mf file contains instructions for executing build paths (e.g., "roads," "walls," etc.) during the printing of the object. These instructions are provided to a Bambu Lab 3D printer and executed by the printer to, for example, generate void regions formed using walls of one width that that are filled in with remnant paths of another width.  For example, the Bambu Lab Wiki describes the concept of wall distribution count as a parameter for adjusting a number of and width of walls. For example, widths of a wall are modified to fill a void formed between other walls.  Bambu Lab thus directly infringed and continues to directly infringe each limitation of at least Claim 15 of the '357 Patent by using in the United States, without authorization the Accused '357 Products.

127.    To the extent Defendants do not perform each and every limitation of the claims of the '357 Patent, Defendants jointly infringe those claims.  In particular, Bambu Lab directs or controls its users of the Accused '357 Products to perform one or more limitations of the claims nationwide through its own websites, applications, and manuals, and expects and intends that the Accused '357 Products will be so used.  For example, Defendants require customers and users to use the accused products through the applications Defendants produce and distribute for use. Defendants further require users of the accused products to agree to extensive terms and

conditions.  Finally, Defendants' customers realize a tangible benefit by using Defendants' technology to print and manufacture tangible items.

128.    Defendants also indirectly infringe at least Claim 15 of the '357 Patent in violation of 35 U.S.C. 271(b) by taking active steps to encourage and facilitate direct infringement by third parties, including users, partners, affiliates, subsidiaries, resellers, distributors and service providers, in the United States with knowledge and specific intent that its efforts would result in the direct infringement of the '357 Patent.  For example, Defendants actively induce infringement of the '357 Patent by designing, manufacturing, selling, or distributing the Accused '357 Products and then training its customers and users on the use of those products and the accompanying applications, including through the creation and dissemination of supporting materials, maintenance guides, troubleshooting guides, software (including Bambu Studio and Bambu Handy), instructions, product manuals, and technical information.  *See* https://wiki.bambulab.com/en/home.  As another example, Defendants actively induces infringement of the '357 Patent by instructing, encouraging, or requiring their subsidiaries and affiliates in the United States to use, sell, offer for sale in the United States, and importing into the United States, without authorization, the accused products that practice various claims of the '357 Patent, such as any Bambu Lab printer that is used in combination with the corresponding applications or controllers (e.g., the Bambu Studio and Bambu Handy, etc.).  As yet another example, Defendants actively induce infringement of the '357 Patent through the creation and dissemination of promotional and marketing materials and instructional videos.  *See* https://www.youtube.com/c/BambuLab. Defendants' active inducement is done with the knowledge and the specific intent that its efforts would result in the direct infringement of the '357 Patent.

129.    Defendants were put on notice of their direct and indirect infringement of the '357 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '357 Patent and knowledge of how Defendants induce third parties to infringe that patent at least as early as August 5, 2024.

130.    Defendants are also liable for contributory infringement of the '357 Patent under 35 U.S.C. 271(c) by selling or offering for sale the Accused '357 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States and importing the Accused '357 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States with knowledge that they are especially designed or adapted to operate in a manner that infringes the '357 Patent and are not a staple article or commodity of commerce suitable for substantially non-infringing use.  Defendants contribute to infringement of the '357 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused '357 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) to third parties.

131.    Defendants also have had knowledge of how Defendants infringe the '357 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '357 Patent and knowledge of how Defendants contribute to third parties' infringement of that patent at least as early as August 5, 2024.

132.    Defendants' infringement of the '357 Patent has been and continues to be willful. At least as early as August 5, 2024, Defendants were notified of their infringing acts and deliberately continued to infringe the '357 Patent despite knowing of the existence of the patent and how Defendants infringe.  Further, Defendants have deliberately continued to encourage

others' infringement of the '357 Patent, including by continuing to disseminate its marketing and technical materials to customers.

133.    Defendants' acts of infringement have injured and damaged Stratasys and will continue to injure and damage Stratasys.  Stratasys is therefore entitled to recover from Defendants the damages it has sustained as a result of Defendants' wrongful and continued acts in an amount to be proven at trial.

134.    Defendants' infringement has damaged and will continue to damage Stratasys irreparably, and Stratasys has no adequate remedy at law for its injuries.  In addition to actual damages, Stratasys is entitled to a permanent injunction enjoining Defendants from infringing the '357 Patent.

135.    Stratasys is entitled to all damages to which it otherwise is entitled because it has complied with 35 U.S.C. 287 by marking its patent-practicing products with the number of the '357 Patent.

## COUNT 4: U.S. Patent No. 9,168,698

136.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

137.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

138.    On October 27, 2015, the United States Patent Office (USPTO) duly and lawfully issued United States Patent No. 9,168,698, entitled "Three-Dimensional Printer With Force Detection." By assignment, duly recorded with the USPTO, Stratasys owns all substantial rights to the '698 Patent, including the right to sue and recover damages for all infringement.

139.    The '698 Patent generally relates to methods for detecting contact force against an extruder or other tool head of a three-dimensional printer.

140.    Bambu Lab has directly infringed, and continues to directly infringe the '698 Patent in violation of 35 U.S.C. 271(a) by using in the United States, without authorization, the accused products that practice various claims of the '698 Patent literally or under the doctrine of equivalents.  Those products include, for example, Bambu's A1 and A1 mini printers.

141.    As a non-limiting example, the Accused '698 Products meet every element of at least Claim 1 of the '698 Patent literally or under the doctrine of equivalents.  Claim 1 recites:

> 1. A method comprising:
>
> identifying build instructions for fabricating an object;
>
> initiating a build using a three-dimensional printer comprising a fabrication tool and one or more sensors mechanically coupled to the fabrication tool, the one or more sensors configured to detect a current contact force between the fabrication tool and a separate structure;
>
> detecting the current contact force based on a sensor signal from the one or more sensors; and
>
> creating a control signal to control at least one component of the three-dimensional printer in response to the current contact force while depositing material during the build.

142.     For example, Bambu Lab makes, uses, sells and offers to sell various additive manufacturing systems (i.e., 3D printers), including the A1 and A1 mini, which are used for fabricating three-dimensional parts using build instructions.  A request to fabricate an object from build instructions can be received at least via the user interface on the printer and via the Bambu Studio or Handy apps.  The Bambu Labs A1 and A1 mini 3D printers include an extrusion nozzle with an extrusion force sensor (e.g., an eddy force sensor).  The force sensor is used to detect a force caused by nozzle clumping (e.g., the force of filament material clumped around the nozzle

being pushed against the heatbed) and to automatically stop a print job based on this detected force. Bambu Lab thus directly infringed and continues to directly infringe each limitation of at least Claim 1 of the '698 Patent by using in the United States, without authorization the Accused '698 Products.

143.    To the extent Defendants do not perform each and every limitation of the claims of the '698 Patent, Defendants jointly infringe those claims.  In particular, Bambu Lab directs or controls its users of the Accused '698 Products to perform one or more limitations of the claims nationwide through its own websites, applications, and manuals, and expects and intends that the Accused '698 Products will be so used.  For example, Defendants require customers and users to use the accused products through the applications Defendants produce and distribute for use. Defendants further require users of the accused products to agree to extensive terms and conditions.  Finally, Defendants' customers realize a tangible benefit by using Defendants' technology to print and manufacture tangible items.

144.    Defendants also indirectly infringe at least Claim 1 of the '698 Patent in violation of 35 U.S.C. 271(b) by taking active steps to encourage and facilitate direct infringement by third parties, including users, partners, affiliates, subsidiaries, resellers, distributors and service providers, in the United States with knowledge and specific intent that its efforts would result in the direct infringement of the '698 Patent.  For example, Defendants actively induce infringement of the '698 Patent by designing, manufacturing, selling, or distributing the Accused '698 Products and then training its customers and users on the use of those products and the accompanying applications, including through the creation and dissemination of supporting materials, maintenance guides, troubleshooting guides, software (including Bambu Studio and Bambu Handy), instructions, product manuals, and technical information.    *See*

- 49 -

https://wiki.bambulab.com/en/home. As another example, Defendants actively induces infringement of the '698 Patent by instructing, encouraging, or requiring their subsidiaries and affiliates in the United States to use, sell, offer for sale in the United States, and importing into the United States, without authorization, the accused products that practice various claims of the '698 Patent, such as any Bambu Lab printer that is used in combination with the corresponding applications or controllers (e.g., the Bambu Studio and Bambu Handy, etc.). As yet another example, Defendants actively induce infringement of the '698 Patent through the creation and dissemination of promotional and marketing materials and instructional videos. *See* https://www.youtube.com/c/BambuLab. Defendants' active inducement is done with the knowledge and the specific intent that its efforts would result in the direct infringement of the '698 Patent.

145.    Defendants were put on notice of their direct and indirect infringement of the '698 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '698 Patent and knowledge of how Defendants induce third parties to infringe that patent at least as early as August 5, 2024.

146.    Defendants are also liable for contributory infringement of the '698 Patent under 35 U.S.C. 271(c) by selling or offering for sale the Accused '698 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States and importing the Accused '698 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States with knowledge that they are especially designed or adapted to operate in a manner that infringes the '698 Patent and are not a staple article or commodity of commerce suitable for substantially non-infringing use. Defendants contribute to infringement of the '698 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused '698 Products

and/or other components (e.g., filament, automatic material system, build plates, etc.) to third parties.

147.    Defendants also have had knowledge of how Defendants infringe the '698 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '698 Patent and knowledge of how Defendants contribute to third parties' infringement of that patent at least as early as August 5, 2024.

148.    Defendants' infringement of the '698 Patent has been and continues to be willful. At least as early as August 5, 2024, Defendants were notified of their infringing acts and deliberately continued to infringe the '698 Patent despite knowing of the existence of the patent and how Defendants infringe.  Further, Defendants have deliberately continued to encourage others' infringement of the '698 Patent, including by continuing to disseminate its marketing and technical materials to customers.

149.    Defendants' acts of infringement have injured and damaged Stratasys and will continue to injure and damage Stratasys.  Stratasys is therefore entitled to recover from Defendants the damages it has sustained as a result of Defendants' wrongful and continued acts in an amount to be proven at trial.

150.    Defendants' infringement has damaged and will continue to damage Stratasys irreparably, and Stratasys has no adequate remedy at law for its injuries.  In addition to actual damages, Stratasys is entitled to a permanent injunction enjoining Defendants from infringing the '698 Patent.

151.    Stratasys is entitled to all damages to which it otherwise is entitled because it has complied with 35 U.S.C. 287 by marking its patent-practicing products with the number of the '698 Patent.

## COUNT 5: U.S. Patent No. 10,556,381

152.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

153.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

154.    On February 11, 2020, the United States Patent Office (USPTO) duly and lawfully issued United States Patent No. 10,556,381, entitled "Three-Dimensional Printer With Force Detection." By assignment, duly recorded with the USPTO, Stratasys owns all substantial rights to the '381 Patent, including the right to sue and recover damages for all infringement.

155.    The '381 Patent generally relates to a three-dimensional printer that includes an extruder or another tool head to detect contact forces during fabrication.

156.    Bambu Lab has directly infringed, and continues to directly infringe the '381 Patent in violation of 35 U.S.C. 271(a) by using, selling, offering for sale in the United States, and importing into the United States, without authorization, the accused products that practice various claims of the '381 Patent literally or under the doctrine of equivalents. Those products include, for example, Bambu's A1 and A1 mini printers.

157.    As a non-limiting example, the Accused '381 Products meet every element of at least Claim 1 of the '381 Patent literally or under the doctrine of equivalents. Claim 1 recites:

> 1. A three-dimensional printer comprising:
>
> a fabrication tool including an extruder configured to extrude build material to fabricate an object during a build process;
>
> one or more sensors mechanically coupled to the extruder, wherein the one or more sensors are collectively operable to sense a contact force between the extruder and a separate structure distinct from the fabrication tool; and

a controller configured to receive a signal from the one or more sensors on the extruder and to calculate the contact force between the extruder and the separate structure.

158.    For example, Bambu Lab makes, uses, sells and offers to sell various additive manufacturing systems (i.e., 3D printers), including the A1 and A1 mini, which are used for fabricating three-dimensional parts using build instructions.  A request to fabricate an object from build instructions can be received at least via the user interface on the printer and via the Bambu Studio or Handy apps.  The Bambu Labs A1 and A1 mini 3D printers include an extrusion nozzle with an extrusion force sensor (e.g., an eddy force sensor).  The force sensor is used to detect a force caused by nozzle clumping (e.g., the force of filament material clumped around the nozzle being pushed against the heatbed) and to automatically stop a print job based on this detected force. Bambu Lab thus directly infringed and continues to directly infringe each limitation of at least Claim 1 of the '381 Patent by using, selling, offering for sale in the United States, and importing into the United States, without authorization the Accused '381 Products.

159.    To the extent Defendants do not perform each and every limitation of the claims of the '381 Patent, Defendants jointly infringe those claims.  In particular, Bambu Lab directs or controls its users of the Accused '381 Products to perform one or more limitations of the claims nationwide through its own websites, applications, and manuals, and expects and intends that the Accused '381 Products will be so used.  For example, Defendants require customers and users to use the accused products through the applications Defendants produce and distribute for use. Defendants further require users of the accused products to agree to extensive terms and conditions.  Finally, Defendants' customers realize a tangible benefit by using Defendants' technology to print and manufacture tangible items.

160.    Defendants also indirectly infringe at least Claim 1 of the '381 Patent in violation of 35 U.S.C. 271(b) by taking active steps to encourage and facilitate direct infringement by third

parties, including users, partners, affiliates, subsidiaries, resellers, distributors and service providers, in the United States with knowledge and specific intent that its efforts would result in the direct infringement of the '381 Patent.  For example, Defendants actively induce infringement of the '381 Patent by designing, manufacturing, selling, or distributing the Accused '381 Products and then training its customers and users on the use of those products and the accompanying applications, including through the creation and dissemination of supporting materials, maintenance guides, troubleshooting guides, software (including Bambu Studio and Bambu Handy), instructions, product manuals, and technical information.  *See* https://wiki.bambulab.com/en/home.  As another example, Defendants actively induces infringement of the '381 Patent by instructing, encouraging, or requiring their subsidiaries and affiliates in the United States to use, sell, offer for sale in the United States, and importing into the United States, without authorization, the accused products that practice various claims of the '381 Patent, such as any Bambu Lab printer that is used in combination with the corresponding applications or controllers (e.g., the Bambu Studio and Bambu Handy, etc.).  As yet another example, Defendants actively induce infringement of the '381 Patent through the creation and dissemination of promotional and marketing materials and instructional videos.  *See* https://www.youtube.com/c/BambuLab.  Defendants' active inducement is done with the knowledge and the specific intent that its efforts would result in the direct infringement of the '381 Patent.

161.    Defendants were put on notice of their direct and indirect infringement of the '381 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '381 Patent and knowledge of how Defendants induce third parties to infringe that patent at least as early as August 5, 2024.

162.    Defendants are also liable for contributory infringement of the '381 Patent under 35 U.S.C. 271(c) by selling or offering for sale the Accused '381 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States and importing the Accused '381 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) in the United States with knowledge that they are especially designed or adapted to operate in a manner that infringes the '381 Patent and are not a staple article or commodity of commerce suitable for substantially non-infringing use.  Defendants contribute to infringement of the '381 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused '381 Products and/or other components (e.g., filament, automatic material system, build plates, etc.) to third parties.

163.    Defendants also have had knowledge of how Defendants infringe the '381 Patent at least as early as August 5, 2024 through a notice letter sent to Defendants. Defendants have knowledge of the '381 Patent and knowledge of how Defendants contribute to third parties' infringement of that patent at least as early as August 5, 2024.

164.    Defendants' infringement of the '381 Patent has been and continues to be willful. At least as early as August 5, 2024, Defendants were notified of their infringing acts and deliberately continued to infringe the '381 Patent despite knowing of the existence of the patent and how Defendants infringe.  Further, Defendants have deliberately continued to encourage others' infringement of the '381 Patent, including by continuing to disseminate its marketing and technical materials to customers.

165.    Defendants' acts of infringement have injured and damaged Stratasys and will continue to injure and damage Stratasys.  Stratasys is therefore entitled to recover from Defendants

the damages it has sustained as a result of Defendants' wrongful and continued acts in an amount to be proven at trial.

166.    Defendants' infringement has damaged and will continue to damage Stratasys irreparably, and Stratasys has no adequate remedy at law for its injuries.  In addition to actual damages, Stratasys is entitled to a permanent injunction enjoining Defendants from infringing the '381 Patent.

167.    Stratasys is entitled to all damages to which it otherwise is entitled because it has complied with 35 U.S.C. 287 by marking its patent-practicing products with the number of the '381 Patent.

## COUNT 6: False Advertising Under 15 U.S.C. § 1125(a) et sec.

168.    Stratasys repeats and re-alleges each of the allegations in the foregoing paragraphs as if fully set forth herein, specifically paragraphs 22 through 84 above.

169.    As part of the pleadings and discovery responses in this matter, Defendants have represented that:

    i.    their 3D printers do not create a control signal to control at least one component of the three-dimensional printer in response to the current contact force while depositing material during the build;

    ii.    their 3D printers do not have a controller configured to receive a signal from the one or more sensors on the extruder and to calculate the contact force between the extruder and the separate structure;

    iii.    their 3D printers do not include a tag sensor;

    iv.    their 3D printers do not receive a request from a client over a network to fabricate an object on the three-dimensional printer, or that the three-dimensional printer is

coupled to a supply of a build material including a tag sensor that stores a property of the build material;

v.    their 3D printers do not perform tests to determine whether the operation is suitable for the three-dimensional printer;

vi.    their 3D printers do not receive a three-dimensional model over a network;

vii.    their 3D printers do not transmit the status of the print job for display at a remote client over a network;

viii.    their 3D printers do not print layers of a three-dimensional part and a support structure from multiple print heads or deposition lines;

ix.    their 3D printers do not switch the print heads or deposition lines between stand-by mode and operating mode in between the printing of the layers;

x.    their 3D printers do not perform a purge operation for each print head or deposition line switched to the operating mode and that their 3D printers do not print a purge tower that is printed from the print head or deposition line switched to the operating mode; and

xi.    that their 3D printers do not have a build platform with a temperature control unit configured to control heating of the build platform.

*See* Ex. 1 (Defendants Response to Stratasys's Interrogatory No. 2) (dated January 22, 2025)

170.    Defendants first provided this information above in a signed discovery pleading on January 22, 2025.

Defendants again provided these discovery responses in signed discovery pleadings dated March 25, April 25, May 12, July 15, August 20 and August 27, 2025. *See* Ex. 2 (Defendants

Response to Stratasys's Interrogatory No. 2) (dated March 25, 2025); Ex. 3 (Defendants

Response to Stratasys's Interrogatory No. 2) (dated April 25, 2025); Ex. 4 (Defendants Response

to Stratasys's Interrogatory No. 2) (dated May 12, 2025); Ex. 5 (Defendants Response to

Stratasys's Interrogatory No. 2) (dated July 15, 2025); Ex. 6 (Defendants Response to Stratasys's

Interrogatory No. 2) (dated August 20, 2025); Ex. 7 (Defendants Response to Stratasys's

Interrogatory No. 2) (dated August 27, 2025).

171.    Upon information and belief and pursuant to Fed. R. Civ. P.. 11(b)(3) and (4),

Defendants certified that the information provided above in response to Stratasys's Interrogatory

No. 2 was true and accurate and with evidentiary support.

172.    Upon information and belief and pursuant to Fed. R. Civ. P.. 11(b)(3) and (4),

Defendants would not have made the statements they made in response to Stratasys's Interrogatory

No. 2 had it been untrue or inaccurate.

173.    The statements made by Defendants in response to Stratasys's Interrogatory No. 2

undermine and negate the statements made by Defendants in their advertising and marketing

materials available publicly on their website and their Wiki site.  Specifically, upon information

and belief, the statements made by BambuLab identified above in paragraphs 22-84 are false and

misleading as evidenced by Defendants' response to Stratasys's Interrogatory No. 2.

174.    Upon information and belief, Defendants have engaged in false advertising under

15 U.S.C. § 1125(a) by making false advertisements to the public at large, including to

BambuLab's and Stratasys's customers. Through these false advertisements, Defendants have

materially misrepresented at least the nature and characteristics of Defendants' own 3D printer and

associated hardware and software products.

175.    Defendants caused their false advertising to enter interstate commerce, including upon information and belief in the Eastern District of Texas. Defendants' false advertising has at been distributed through at least Internet advertisements including, but not limited to, advertisements placed on their own website and Wiki site, which are all publicly available and accessible.  Defendants' 3D printer products are also sold in interstate commerce.

176.    Defendants' actions have deceived, or are likely to deceive, a substantial segment of the public (including Defendants' and Stratasys's) customers who have purchased or would otherwise purchase 3-D printers. Actual and potential customers of Stratasys relied upon and were deceived by BambuLab's false and misleading statements.

177.    BambuLab's false, misleading and deceptive statements concern inherent qualities or characteristics of their 3D printers and associated hardware and software. Therefore, upon information and belief BambuLab's false, misleading, and deceptive statements were material to the customers' purchasing decisions and either did influence or had a substantial likelihood of influencing their purchasing decisions.

178.    Defendants' actions have caused Stratasys injury, including to its commercial and business interests. Upon information and belief, Stratasys's commercial injuries are a direct result of Defendants' false statements directed to the customers and to public at large.

179.    Therefore, BambuLab's material, false, misleading and deceptive statements violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Stratasys is entitled to a judgment that Defendants have engaged in false advertising under 15 U.S.C. 1125(a) and damages pursuant to 15 U.S.C. 1117.

180.    BambuLab has caused, and will continue to cause, immediate irreparable injury to Stratasys, including injury to Stratasys's business, reputation and goodwill, for which there is no

adequate remedy at law. Stratasys is thus entitled to an injunction under 15 U.S.C. § 1116 restraining BambuLab from engaging in future acts of false advertising.

181.    Pursuant to 15 U.S.C. § 1117, Stratasys is further entitled to recover from BambuLab: the damages sustained by Stratasys as a result of BambuLab's acts in violation of 15 U.S.C. § 1125(a); the gains, profits and advantages that NetMotion has obtained as a result of NetMotion's acts in violation of 15 U.S.C. § 1125(a); and the costs of this action.

182.    Moreover, the false statements made by BambuLab were made deliberately and willfully with the intention of causing confusion, mistake, or deception, and are presumed to be actually deceptive statements on which consumers and customers relied. Thus, this is an exceptional case entitling Stratasys to recover enhanced damages and reasonable attorneys' fees.

## VI.    JURY DEMAND

183.    Plaintiff hereby demands a trial by jury.

184.    The '713 Patent, the '660 Patent, the '357 Patent, the '698 Patent and the '381 Patent are collectively referred to as "Asserted Patents."

## PRAYER

WHEREFORE, Plaintiff prays for judgment in their favor on all counts in the Complaint and requests relief as follows:

A.    Declaring that Defendants have infringed the Asserted Patents, directly and indirectly, literally and/or under the doctrine of equivalents.

B.    Awarding Stratasys damages arising out of this infringement of the Asserted Patents, including enhanced damages pursuant to 35 U.S.C. 284.

C.  Permanently enjoining Defendants and their respective officers, agents, servants, employees, and those acting in privity with it, from further infringement, including inducing infringement and contributory infringement, of the Asserted Patents.

D.  Awarding attorneys' fees to Stratasys pursuant to 35 U.S.C. 285 or as otherwise permitted by law; and

E.  A judgment in favor of Stratasys that Defendant had engaged in false advertising, and order requiring Defendants to pay monetary relief to Stratasys, including (i) profits received by Defendants and/or damages sustained by Stratasys as a result of Defendants' false advertising (ii) damages in the form of money to be spent on corrective advertising, to dispel any actual confusion that may have already occurred among relevant consumers and in the marketplace by virtue of Defendants' false advertising and (iii) any and all relief allowed under the Lanham Act;

F.  That Defendants be found to have acted willfully in its false advertising, and that monetary relief for Defendants' false advertising be increased due to the wilfull nature of Defendants' false advertising pursuant to 15 U.S.C. § 1117;

G.  A declaration that this is an exceptional case within the meaning of 35 U.S.C. § 285, 15 U.S.C. § 1117(a) and/or other applicable laws, and that Stratasys is entitled to recover its reasonable attorney's fees and costs upon prevailing in this action;

H.  Awarding to Stratasys such other costs and further relief as the Court deems just and proper.

Dated: September 17, 2025

Respectfully submitted,

By: */s/ Kevin Meek*

Kevin J. Meek
Texas Bar No. 13899600
Brian Oaks
Texas Bar No. 24007767
Syed K. Fareed
Texas Bar No. 24065216
Aashish Kapadia
Texas Bar No. 24097917
Christian Tatum
Texas State Bar No. 24125429
**MCDERMOTT WILL & SCHULTE LLP**
300 Colorado Street, Suite 2200
Austin, Texas 78701-4078
Telephone: (512) 726-2600
Facsimile: (512) 532-0002
kmeek@mwe.com
boaks@mwe.com
sfareed@mwe.com
akapadia@mwe.com
ctatum@mwe.com

Deron R. Dacus
Texas Bar No. 00790553
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
903-705-1117 (phone)
903-581-2543 (fax)
ddacus@dacusfirm.com

Andrea L. Fair
Texas Bar No. 24078488
Claire A. Henry
Texas Bar No. 24053063
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
andrea@wsfirm.com

***ATTORNEYS FOR PLAINTIFF STRATASYS, INC.***