**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| Stratasys, Inc., *Plaintiff*, v. Shenzhen Tuozhu Technology Co., Ltd., *et al.*, *Defendants*. | § § § § § § § | Case No. 2:24-cv-00644-JRG (Lead Case) |
| Stratasys, Inc., *Plaintiff*, v. Shenzhen Tuozhu Technology Co., Ltd., *et al.*, *Defendants*. | § § § § § § § § | Case No. 2:24-cv-00645-JRG (Member Case) |
| BambuLab USA, Inc., *et al.*, *Plaintiffs*, v. Stratasys, Inc. *Defendant*. | § § § § § § | Case No. 2:25-cv-00465-JRG (Member Case) |

**PLAINTIFF'S RESPONSE TO BAMBU'S MOTION TO STRIKE EXPERT OPINIONS
OF DAVID KENNEDY (DKT. NO. 190)[1]**

---

[1] Defendants' motion (Dkt. No. 190) is apparently not double-spaced as required by L.R. CV-10(a)(5). *Compare, e.g.*, (Dkt. No. 190) (27 lines of text per page on average) *with* (Dkt. Nos. 174-180, 182, 186, and 192) (Defendants' double-spaced motions with 23-24 lines of text per page on average). An extra 3-4 lines per page would yield an additional 1 to 1.5 pages of argument.

████████████

**TABLE OF CONTENTS**

I.    ARGUMENT...........................................................................................................................1

   A.    Mr. Kennedy's Survey-Based Apportionment Is Reliable And Well Within Accepted Damages Methodology ..............................................................................................1

      1.    Bambu Cannot Disown Its Own Survey ................................................................1

      2.    The 51% Allocation Is a Conservative, Fact-Based Approach Based on Technical Findings, Not a "Rule of Thumb"...........................................................2

   B.    Mr. Kennedy's Convoyed Sales Analysis Is Grounded in Functional Integration and Established Law ..............................................................................................................4

      1.    Bambu Misstates the Demand Requirement by Importing the Entire Market Value Rule Where It Does Not Belong..................................................................6

      2.    Bambu's Survey Critique Attacks a Strawman and Ignores the Economic Role the Survey Plays in the Opinion .........................................................................7

      3.    Bambu's "Double Counting" Attack Is Rooted In Speculation..............................7

   C.    Mr. Kennedy's Analysis Correctly Determines Damages Based On Extent Of Use ....................8

   D.    Mr. Kennedy Does Not Improperly Opine On Future Damages...............................................11

II.    CONCLUSION...................................................................................................................12

███████████

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cirba Inc. v. VMware, Inc.*,
No. CV 19-742-GBW, 2023 WL 3151853 (D. Del. Apr. 18, 2023) ........................................8

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
2017 WL 1079441 (E.D. Tex. Apr. 6, 2017)...................................................................4

*Exafer Ltd. v. Microsoft Corp.*,
No. 2024-2296, slip op. (Fed. Cir. Mar. 6, 2026) ...................................................5

*Finesse Wireless LLC v. AT&T Mobility LLC*,
No. 2:21-cv-00316-JRG-RSP, Dkt. 339 (E.D. Tex. Aug. 30, 2023) .......................................12

*Genuine Enabling Tech. LLC v. Sony Corp.*,
2022 WL 17325656 (D. Del. 2022) .........................................................................6

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983).............................................................................8

*Honestech, Inc. v. Sonic Sols.*,
430 F. App'x 359 (5th Cir. 2011).........................................................................2

*Infinity Computer Prods., Inc. v. Epson Am., Inc.*,
2018 WL 7890859 (C.D. Cal. Dec. 14, 2018) ................................................................6

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001)........................................................................4, 11

*KAIST IP US LLC v. Samsung*,
439 F. Supp. 3d 857 (E.D. Tex. 2020).....................................................................12

*Lone Star Techn. Innov. v. ASUSTek Computer Inc.*,
2022 WL 21714403 (E.D. Tex., Jun. 23, 2022)..............................................................2

*Longhorn HD LLC v. Netscout Sys., Inc.*,
2022 WL 903934 (E.D. Tex. Mar. 27, 2022) ................................................................6

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009).....................................................................8, 11, 12

*Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*,
2017 WL 4020591 (E.D. Tex. Sept. 13, 2017)...............................................................3

██████████

*PACT XPP Techs., AG v. Xilinx, Inc.*,
   No. 2:07-CV-563-RSP, 2012 WL 1666390 (E.D. Tex. May 11, 2012) ....................................1

*Realtime Data LLC v. Echostar Corp.*,
   2018 WL 6266301 (E.D. Tex. 2018) ..................................................................................4, 5

*Realtime Data LLC v. NetApp, Inc.*,
   No. 6:16-cv-00961, 2017 WL 5756863 (E.D. Tex. Nov. 28, 2017).........................................6

*Red Rock Analytics, LLC v. Samsung Elecs. Co., Ltd.*,
   No. 2:17-cv-101-RWS-RSP, 2019 WL 13212713 (E.D. Tex. Feb. 6, 2019) ..........................12

*Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*,
   791 F.2d 423 (5th Cir. 1986) ...............................................................................................2

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)........................................................................................8, 12

*Uniloc USA, Inc. v Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)............................................................................................3

**Other Authorities**

Rule 702 ..................................................................................................................5, 8, 9, 11

iii



Mr. Kennedy relied on ███████████████████████, and documentation regarding default product operation, and applied a conservative apportionment and convoyed-sales framework. Bambu's challenges go to weight, not admissibility under *Daubert*.

## I.    ARGUMENT



2. The 51% Allocation Is a Conservative, Fact-Based Approach Based on Technical Findings, Not a "Rule of Thumb"

Bambu next attacks Mr. Kennedy's 51% allocation as an arbitrary rule of thumb. That argument misstates both the record and the law. Mr. Kennedy did not apply a generic percentage untethered to the facts of this case. Rather, he grounded his allocation in detailed and unchallenged technical opinions from

██████████

Dr. Osswald and Dr. Gall. Those experts explained that when they describe a patent as "materially enabling" a feature, they mean that the patented technology provides essential functionality without which the feature would not operate in its commercially acceptable form. Ex. F (Osswald Op. Rpt.) at ¶ 437; Ex. G (Gall Op. Rpt.) at ¶ 611. They further explained that such patents account for a substantial portion of the feature's functionality and are not minor or ancillary contributions. *Id.*

Supplied with technical testimony that the asserted patents supply material and indispensable functionality to customer-valued features, Mr. Kennedy provided his conservative economic allocation to the technical experts' conclusion, based on his expertise as a CPA and an economist. He did not claim that the patents account for all of a feature's value. Instead, he conservatively assigned only a bare majority (51%), leaving rest of the feature's value to non-patented aspects such as branding, manufacturing quality, other non-asserted features, and expired foundational patents. Ex. C (Kennedy Rpt.) at ¶ 191. He then divided that 51% share among the patents materially enabling the feature, and where patents had overlapping benefits, he treated them jointly to avoid double counting.

That methodology is the opposite of the discredited 25% rule rejected in *Uniloc* where the expert applied a generic baseline divorced from the facts and technology of the case. *Uniloc USA, Inc. v Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). Here, the 51% allocation flows directly from case-specific technical findings from technical experts that are unchallenged, as well as Mr. Kennedy's experience as a CPA and his application of accounting principles to the technical experts' findings. *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, 2017 WL 4020591, at *7 (E.D. Tex. Sept. 13, 2017) (denying motion to exclude testimony on apportionment, specifically that "at least 50% of the benefit … is attributable to the [patent]" and finding that the challenge went to the weight, not admissibility).

Bambu further contends that the 51% figure does not come ██████████ or the technical experts. Dkt. 190 at 3. That is incorrect. ████████████████████████████

██████████ The technical experts identify which patents materially enable ██████████

3

██████████████████

███████████████████████████████████████████████████████

███████████████████████████ Damages experts routinely convert technical assessments into apportionment. The law does not require precise numeric valuations from technical experts before an economist performs apportionment. *Eidos Display, LLC v. Chi Mei Innolux Corp.*, 2017 WL 1079441, at *3 (E.D. Tex. Apr. 6, 2017) ("The ultimate apportionment value … must rest with [the] damages expert [not the technical expert].") Finally, Bambu claims that other patents "may" materially enable certain features. Dkt. 190 at 3. ████████████████████████████████

████████████████████████████████████████████████████

████ If Bambu believed otherwise, it was free to present that evidence. It did not.

### B.   Mr. Kennedy's Convoyed Sales Analysis Is Grounded in Functional Integration and Established Law[2]

Bambu's challenge to Mr. Kennedy's convoyed-sales analysis rests on the mistaken premise that inclusion of filament and accessories improperly "adds unaccused products" to the royalty base. Not so. The law permits consideration of convoyed sales where there is a functional relationship between the patented product and the non-patented item, where the products are sold together, and where the non-patented item is necessary for operation or forms part of a single functional unit. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385–86 (Fed. Cir. 2001); *Realtime Data LLC v. Echostar Corp.*, 2018 WL 6266301, at *6–*7 (E.D. Tex. 2018).

Mr. Kennedy applied that framework directly to the record. He explained that filament is essential to the operation of a 3D printer; without filament, the printer cannot perform its intended function, just as a traditional printer cannot operate without ink. Ex. C (Kennedy Rpt.) ¶¶ 465–466. He further showed that Bambu markets its printers, AMS units, filaments, and accessories as an integrated ecosystem, using compatibility filters and printer-specific SKUs. These products are not general-purpose

---

[2] Bambu's arguments with respect to convoyed sales appear in Sections II.A.3 and II.B of Dkt. 190. Stratasys addresses both arguments in this section.

goods sold independently of the accused printers; they are designed to operate with those printers and derive their commercial value from that relationship. *Id.* Mr. Kennedy's deposition testimony reinforces this dependency: "the filament and the accessories that Bambu has sold in connection with the printers are … closely tied to the sales of the accused products. For example, filaments are used by the printer. You can't use the printer without filaments." Ex. E (Kennedy Dep.) 215:14–217:15.[3] That real-world interdependence satisfies the functional-unit requirement courts routinely apply when permitting convoyed-sales opinions. *See Realtime*, 2018 WL 6266301, at \*6–\*7 (allowing convoyed sales where bundled items were designed to operate together and were largely useless without their counterpart).

Mr. Kennedy also articulated the economic mechanism linking patented functionality to downstream revenue. He explained that improvements enabled by the patented technology increase reliability, automation, and print success rates (as the technical experts opine), which in turn increase printer usage and increases filament and accessory purchases. Ex. C (Kennedy Rpt.) ¶ 467. That causal linkage makes those downstream sales foreseeable and license-relevant under *Georgia-Pacific* Factor 6.[4] Bambu's suggestion that Mr. Kennedy's opinion is unreliable because he is not a technical expert misses the point. The relevant inquiry under Rule 702 is not whether Mr. Kennedy can personally operate a 3D printer, but whether his damages opinion rests on a reliable factual foundation—which they are.

Bambu also argues that Mr. Kennedy should have investigated third-party replacement components. Dkt. 190 at 6. That is a non sequitur. The convoyed-sales question is whether *Bambu's* sales of its *own* filaments and accessories are tied to its accused printers and how that affects the economic bargain for a license. The mere possibility that third parties might sell compatible alternatives does not

---

[4] The Federal Circuit also recently reiterated that Rule 702 does not impose a categorical bar on damages models that use a valuation base associated with an unaccused product; rather, courts must assess the case-specific facts and whether the model reflects how the parties would value the accused technology in the hypothetical negotiation, including where the base is used to capture benefits causally linked to the accused features. *Exafer Ltd. v. Microsoft Corp.*, No. 2024-2296, slip op. at 6–7 (Fed. Cir. Mar. 6, 2026).

negate functional dependency between *Bambu's* printers and *Bambu's* filaments/accessories, and it certainly does not transform Mr. Kennedy's opinion into speculation. To the extent Bambu's argument has any logic, it is (at most) fodder for cross-examination—not exclusion.

    1.    Bambu Misstates the Demand Requirement by Importing the Entire Market Value Rule Where It Does Not Belong

Bambu argues that Mr. Kennedy must show the asserted patents "drive demand" under the entire market value rule before convoyed sales can be considered. Dkt. 190 at 5. That overstates the law. Courts have recognized that convoyed sales can be relevant even when the patentee cannot meet the entire market value rule. *Longhorn HD LLC v. Netscout Sys., Inc.*, 2022 WL 903934, at \*4 (E.D. Tex. Mar. 27, 2022) (denying defendant's *Daubert* motion because inclusion of "convoyed maintenance revenues in the hypothetical negotiation is permissible and does not require Plaintiff to show that the patented invention satisfies the entire market rule before considering convoyed maintenance revenues."); *Infinity Computer Prods., Inc. v. Epson Am., Inc.*, 2018 WL 7890859, at \*3 (C.D. Cal. Dec. 14, 2018) ("The Court also rejects Defendant's argument that Plaintiff must show application of the entire market value rule before collateral sales can be considered in the reasonable royalty rate determination."). An expert need not satisfy the entire market value rule in order to consider convoyed sales in the royalty base. *Realtime Data LLC v. NetApp, Inc.*, No. 6:16-cv-00961, 2017 WL 5756863, at \*2–3 (E.D. Tex. Nov. 28, 2017) (rejecting argument that inclusion of convoyed sales requires satisfaction of the entire market value rule and permitting convoyed sales in the royalty base).

Mr. Kennedy explains the mechanism by which the patented features increase usage intensity and frequency, and how that increased usage predictably increases filament and accessory purchases. Ex. C (Kennedy Rpt.) at ¶ 467. That does not implicate EMVR; it is a causally coherent, economically grounded explanation of why downstream sales are foreseeably enhanced by the accused printers with patented functionality, and why that leverage would push the negotiated royalty upward. *Genuine Enabling Tech. LLC v. Sony Corp.*, 2022 WL 17325656, at \*17 (D. Del. 2022) (denying motion to strike

damages opinion applying a royalty to noninfringing games, where expert provided sufficient factual basis to treat the games as convoyed sales tied to patented features).

Bambu also argues that the asserted patents cannot be the basis for demand because they are not "foundational." Dkt. 190 at 6-7. There is no doctrine or legal standard limiting damages to "foundational" patents. A patent can materially enable and add significant commercial value to specific features without being foundational to an industry. Mr. Kennedy's analysis is built around real-world truths: he links specific customer-valued features to the asserted technology and then addresses downstream ecosystem effects through convoyed-sales framework. Bambu's "foundational" rhetoric finds no basis in law.

███████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

### C.     Mr. Kennedy's Analysis Correctly Determines Damages Based On Extent Of Use

Mr. Kennedy's analysis appropriately considers the extent of use of the accused features because it is anchored in record evidence showing how Bambu's printers are configured by default and operate in ordinary use. Mr. Kennedy relies on the technical explanations provided by Dr. Osswald (Stratasys's technical expert) who provided extensive evidence showing the accused features are enabled in default settings. This evidence includes Bambu's own product marketing documentation, as well as testimony by Bambu's own employees. In fact, Bambu touts these same features as key selling points to customers on its marketing websites. Against that backdrop, Bambu's motion improperly tries to convert a factual disagreement about usage into an admissibility attack under Rule 702. That is not what *Daubert* is for.

Federal Circuit law requires a reasonable approximation of damages for method claims, not a rigid tally of end-user activations for default-enabled features. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009) ("we have never laid down any rigid requirement that damages [] be limited to specific instances of infringement … the amount paid for a particular technology is not necessarily limited to the number of times a patented feature is used []."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983) at 1080 (same). Where, as here, a damages expert explains why default-enabled functionality makes product sales a reliable proxy for method performance, the opponent's preferred usage rate is a classic cross-examination point, not a basis for exclusion. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296–97 (Fed. Cir. 2015) (explaining that reasonable royalty estimation "is not an exact science," that there may be "more than one reliable method" for calculating damages, and that flaws in an expert's assumptions or data generally go to weight, not admissibility); *Cirba Inc. v. VMware, Inc.*, No. CV 19-742-GBW, 2023 WL 3151853, at *4 (D. Del. Apr. 18, 2023).

██████████████

Bambu's premise that Mr. Kennedy "fails to evaluate alleged use" is contradicted by the report itself. Mr. Kennedy identifies how the accused features are used by Bambu's printers and software in the ordinary course, as discussed below. *See e.g.*, Ex. C (Kennedy Rpt.) ¶¶ 218–253, 474.[5]

**'357 Patent:** For the '357 Patent, the evidence shows that the accused slicing behavior is enabled by default within Bambu Studio's standard configuration. Bambu's own documentation further corroborates default settings through screenshots showing the classic wall generator selected by default and Rectilinear selected as the "Internal solid infill pattern" by default. Exs. H, I (SSYSBL000453011; SSYSBL000447934.). Stratasys's technical expert (Dr. Osswald) also analyzed these default configurations in his infringement analysis. Ex. F (Osswald Op. Rpt.) ¶¶ 672-674, 744, 762.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Bambu itself markets Bambu Studio as the default slicer software for its X1, P-series, A1-series, and H2-series printers. *See, e.g.*, Ex. J (BAMBU-00382892) ("Bambu Studio is our cutting-edge, feature-rich slicing software developed by Bambu Lab…. Before initiating a print job, you ***must bind your printer to Bambu Studio.***"). ████████████████████████████████████

██████████████████████████████████████ Bambu's argument therefore rests on an unsupported leap from "sometimes used" to "never used." Rule 702 does not require Mr. Kennedy to accept Bambu's unwarranted leap of faith in place of record evidence of default settings.

**'713 Patent:** Bambu's "five conditions" are belied by its own documents that show prime towers are enabled by default for multi-material and multi-color printing tasks. Ex. K (BAMBU-00007703 ("The prime tower is ***enabled by default***")). In other words, the accused method performance is not an

---

[5] Mr. Kennedy also ties the accused features to Bambu's own marketing priorities, relying on Bambu's corporate testimony that the features listed on Bambu's product webpages are generally "relatively more important" selling points. Ex. C (Kennedy Rpt.) at ¶ 218 & Ex. 23; Ex. D (Zhou Dep.) 148:07–149:01.

██████████████

exotic corner case; it is the default setting that Bambu markets. Dr. Osswald addresses the accused method and the relevant system configuration in the '713 Patent context. Ex. F (Osswald Op. Rpt.) ¶¶ 113, 218, 356. Mr. Kennedy likewise ties multi-material printing and AMS usage to Bambu's top advertised selling points. Ex. C (Kennedy Rpt.) at Ex. 23. That matters, because when Bambu itself promotes multi-material capability as a signature feature, the reasonable inference for damages is that a substantial portion of the accused systems are used in that default, ordinary, intended configuration.

**'698 Patent:** For the '698 Patent, Bambu improperly rebrands default settings as "optional." The record shows build plate detection is performed at the start of a build and that the feature is enabled by default. Ex. F (Osswald Op. Rpt.) at ¶¶ 1023-1024. The record also reflects that proper placement of the build plate is required before printing because without a build plate there is no way to perform a 3D print job on a Bambu printer. *See e.g.*, Ex. L (BAMBU-00004096) ("As we all know… the build plate needs to be placed on the heatbed before printing."); Ex. F (Osswald Op. Rpt.) at ¶ 1243.

Bed leveling is even clearer. ████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████ Bambu's own manuals state that bed leveling, calibration, and related functions are set to auto mode by default. Ex. N (BAMBU-00355988) ("Auto Bed leveling … are set to auto mode by default …."); Ex. O (BAMBU-00360587) ("Auto bed leveling … are enabled by default.").

Bambu's clump detection argument similarly fails because the record shows that clump detection is an automatic feature for the A1 printer. Ex. P (BAMBU-00007710) ("By probing the nozzle to the edge of the build plate, A1 can automatically detect filament clumping around the nozzle. ***The detection feature is ON by default*** ….") (emphasis added). Bambu argues that H2 and P2 series printers perform clump detection in two ways, one of which is infringing (probe-based clump detection) and the other is not accused (visual detection means). But the evidence shows that the infringing probe-based method is always on, while the non-accused visual detection system is automatically deactivated at high

10

temperatures forcing the printer to rely on the infringing method exclusively. Ex. Q (BAMBU-00383828) ("[W]hen printing high-temperature materials—especially during the early layers—the nozzle camera area may exceed 85°C due to proximity to the heated bed. ***This leads to automatic deactivation of the visual detection,*** …. To address this, nozzle clumping detection by probing was introduced … for enhanced reliability.") (emphasis added). That same webpage confirms the presence of this functionality across the H2, P2, and A1 series. Thus, far from being a rarely invoked alternative, the probing-based method is operative all the time and is the only method available when the printers are used in demanding, high-temperature conditions that Bambu markets as core capabilities.

Mr. Kennedy's analysis is grounded in record evidence of how the accused printers operate under default settings. Bambu's criticisms go to weight, not admissibility under Rule 702.

### D.    Mr. Kennedy Does Not Improperly Opine On Future Damages

Bambu's motion mischaracterizes Mr. Kennedy's damages analysis. Mr. Kennedy opines that a running royalty would be an appropriate measure of damages, but he also calculates a lump-sum royalty consistent with how real-world licenses are negotiated. Notably, Bambu's own damages expert, Ms. Kindler, likewise opines that a lump sum would be appropriate for at least one asserted patent. Ex. A (Kindler Rpt.) ¶ 11(b).

It is appropriate for Mr. Kennedy to provide a damage number for the possibility that the jury concludes that the parties would have agreed to a lump-sum license rather than a running royalty, and for that lump sum to be correct, it would necessarily include future infringement. *Lucent*, at 1327 ("Parties agreeing to a lump-sum royalty agreement may… consider the expected or estimated usage of a given invention."); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir. 2001) (accepting as suitable factual evidence the parties' "business plan and its projections for future

sales" for damages analysis). Thus, unsurprisingly, courts have repeatedly recognized that a lump-sum royalty properly accounts for projected future infringement. *See Red Rock Analytics, LLC v. Samsung Elecs. Co., Ltd.*, No. 2:17-cv-101-RWS-RSP, 2019 WL 13212713, at *2–3 (E.D. Tex. Feb. 6, 2019) ("a lump sum royalty includes compensation for projected future infringement").

He further notes that under the "Book of Wisdom," the parties may consider future use expected at the time of the negotiation, which is also appropriate. *Id*. ¶ 490; *Lucent*, 580 F.3d 1301, 1327 ("Parties agreeing to a lump-sum royalty agreement may … consider the expected or estimated usage" in the future). Courts have also recognized that running-royalty analyses may support a lump-sum award. *Summit 6, LLC v. Samsung*, 802 F.3d 1283, 1299–1301 (Fed. Cir. 2015); *KAIST IP US LLC v. Samsung*, 439 F. Supp. 3d 857, 887 (E.D. Tex. 2020); *Finesse Wireless LLC v. AT&T Mobility LLC*, No. 2:21-cv-00316-JRG-RSP, Dkt. 339 (E.D. Tex. Aug. 30, 2023).

Contrary to Bambu's suggestion, Mr. Kennedy did not conflate running royalties and lump sums. He provided alternative structures reflecting the evidence and common licensing practice. As he explained, companies often prefer lump-sum licenses where they intend to remain in the business and expect the technology to remain valuable over the life of the patents. Ex. E (Kennedy Dep.) 178:24–179:12. There is no evidence that Bambu intends to exit the market. If Bambu disputes Mr. Kennedy's reliance on its own projected sales, that goes to the weight of the evidence, not admissibility.

## II.    CONCLUSION

For the foregoing reasons, the Court should deny Bambu's motion (Dkt. 190).

Dated: March 16, 2026

Respectfully submitted,

/s/ Syed K. Fareed
Brian Oaks
Texas State Bar No. 24007767
Syed K. Fareed
Texas State Bar No. 24065216
Aashish Kapadia
Texas State Bar No. 24097917
**MCDERMOTT WILL & SCHULTE LLP**
300 Colorado Street, Suite 2200
Austin, Texas 78701-4078
Tel: (512) 726-2579
boaks@mcdermottlaw.com
sfareed@mcdermottlaw.com
akapadia@mcdermottlaw.com

Ian Brooks (pro hac vice)
Christian T. Tatum
Texas State Bar No. 24125429
**MCDERMOTT WILL & SCHULTE LLP**
500 North Capitol Street, NW
Washington, DC 20001
Telephone: (202) 756-8000
Facsimile:  (202) 756-8087
ibrooks@mcdermottlaw.com
ctatum@mcdermottlaw.com

Kevin J. Meek
Texas State Bar No. 13899600
**LAW OFFICES OF KEVIN MEEK, PLLC**
4501 Westlake Drive, Unit #23
Austin, TX 78746
Tel: (512) 422-1244
kevin@meek.law

Deron R. Dacus
Texas State Bar No. 00790553
**THE DACUS FIRM, P.C.**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Tel: (903) 705-1117
ddacus@dacusfirm.com

Andrea L. Fair
Texas State Bar No. 24078488
Claire A. Henry

13



Texas State Bar No. 24053063
**MILLER FAIR HENRY, PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Tel: (903) 757-6400
andrea@millerfairhenry.com
claire@millerfairhenry.com

***ATTORNEYS FOR PLAINTIFF
STRATASYS, INC.***

## CERTIFICATE OF SERVICE

I hereby certify that, on March 16, 2026, a true and correct copy of the foregoing document has been served on all counsel of record.

/s/ Syed K. Fareed
Syed K. Fareed

14